OICIYAPI FEDERAL CREDIT
UNION, Petitioner,

v.

NATIONAL CREDIT UNION
ADMINISTRATION,
Respondent.

No. 90–5337.

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 15, 1991.

Decided June 21, 1991.

Terry Pechota, Rapid City, S.D., for petitioner.

Thomas Bondy, Dept. of Justice, Washington, D.C., argued (Anthony Steinmeyer, Dept. of Justice, Washington, D.C., on brief), for respondent.

Before MAGILL, and BEAM, Circuit Judges, and HEANEY, Senior Circuit Judge.

MAGILL, Circuit Judge.

The Oiciyapi Federal Credit Union petitions for review of the National Credit Union Administration (NCUA) Board's decision to suspend its charter and place it into involuntary liquidation. Oiciyapi argues that the charges on which the Board's action was based are not supported by substantial evidence and that the action itself was arbitrary, capricious, and an abuse of discretion because the Board did not adopt the administrative law judge's recommended decision, because the decision was based in part on unconstitutionally vague criteria, and because the sanction imposed is contrary to the goals and policy of the Federal Credit Union Act. We affirm.

I.

The Oiciyapi Federal Credit Union is located in Rosebud, South Dakota, on a Sioux Indian reservation. It is the only financial institution in the area: the nearest credit union is forty-two miles away, the nearest bank even farther. The reservation economy is depressed. Unemployment is over 80%, and few jobs pay more than minimum wage.

Oiciyapi received its charter in 1966. In 1985, its current troubles with government regulators began when it received a warning letter from the NCUA that its records were in arrears and out of balance, and that an acceptable audit or verification of members' accounts had not been done since 1980. The letter warned that unless these problems were corrected by October 31, 1985, the NCUA might proceed with administrative remedies against the credit union.

Far from improving, the condition of the credit union worsened, and by fall 1986 it was insolvent. The NCUA examiner persuaded Oiciyapi's board of directors to seek voluntary liquidation, but the Rosebud Sioux Tribe bailed out the credit union with a grant of $11,000, and the board of directors withdrew their request.

Over the next few years, the credit union remained solvent and even became profitable. A new manager took over and improved the recordkeeping procedures, but still the books were out of balance from time to time, and generalized problems of sloppy management remained, due largely to the inexperience and unsophistication of Oiciyapi's board of directors.

In July 1989, the NCUA served Oiciyapi with a Notice of Intent to Suspend Charter and Place into Involuntary Liquidation. The notice charged that: (1) the credit union had failed to keep complete and accurate records, as required by the Federal Credit Union Bylaws and the Accounting Manual for Federal Credit Unions; (2) the 1988 election of the board of directors was invalid because of procedural irregularities; (3) the board of directors had failed to appoint a supervisory committee to help manage the credit union, as required by 12 U.S.C. §§ 1761 and 1761b(5) and the Bylaws; (4) the board of directors had awarded themselves a $100 Christmas bonus in 1988, in violation of 12 U.S.C. § 1761's prohibition on compensation; (5) the biennial verification of members' accounts required by 12 U.S.C. § 1761d had not been done since 1986; (6) the credit union was not promoting thrift, which is the purpose of a credit union according to 12 U.S.C. § 1752; (7) the board of directors had failed to establish an effective loan collection program and control delinquency; (8) the board of directors had made loans to themselves and other insiders in amounts that exceeded the credit union's loan limits, in violation of 12 C.F.R. § 701.21(d)(5); (9) the

credit union had charged interest over the 18% limit of 12 C.F.R. § 701.21(c)(7) by collecting a $10 fee from successful loan applicants only; [1] and (10) the credit union had failed to keep records up-to-date and prepare financial statements within the time periods prescribed in the Bylaws.

The credit union requested a hearing, which was held on November 30, 1989, before an administrative law judge (ALJ). The witnesses were two NCUA examiners and the chairman of the credit union's board of directors. After the hearing, affidavits from the manager of the credit union were introduced into evidence. The ALJ found that all the charges had been proved except the second one, concerning the allegedly invalid election. He recommended that the credit union's charter be suspended for sixty days, or until the violations of the Federal Credit Union Act, regulations, and bylaws were remedied; that a public meeting of the credit union's members be called to elect a new board of directors; and that the members and the tribe be notified that the credit union's charter would be revoked unless the foregoing conditions were met. If the credit union did not achieve compliance with the Act, regulations, and bylaws by the end of the sixty-day period, the ALJ recommended that its charter be revoked.

Both sides filed exceptions to the ALJ's decision with the NCUA Board. The Board adopted the ALJ's factual findings, with one exception,[2] amplifying them in response to the parties' objections. The Board declined, however, to adopt the ALJ's proposed remedy. Concluding that the evidence showed "a pattern of mismanagement that threatens the safety and soundness of the credit union," the Board decided to suspend Oiciyapi's charter indefinitely and liquidate it,[3] the relief originally

sought by the NCUA in its Notice of Intent. It appointed the Regional Director of the NCUA as liquidating agent and ordered that all assets, books, records, and other property of the credit union be turned over to him at once. Oiciyapi then petitioned this court for review.

## II.

Federal credit unions are governed by the Federal Credit Union Act (FCUA), 12 U.S.C. §§ 1751–1795j (1988), and by 12 C.F.R. ch. VII (1991). In addition, each credit union must adopt the Federal Credit Union Bylaws in order to be chartered.

The FCUA authorizes the NCUA to suspend, revoke, or liquidate a credit union that "has violated any of the provisions of its charter, its bylaws, this chapter, or any regulations issued thereunder." 12 U.S.C. § 1766(b)(1). If the NCUA decides to do so, the credit union may request a hearing. 12 C.F.R. § 747.703(b) (1989). Where, as here, the hearing is held before an ALJ, the ALJ's recommended decision, together with any exceptions to it filed by the parties, becomes part of the record that goes to the NCUA Board. 12 C.F.R. § 747.110(b). The Board then renders a final agency decision. Any party to the proceeding may petition for review to a federal court of appeals. 12 U.S.C. § 1786(j)(2).

The FCUA provides that hearings are to be conducted according to the procedural requirements of chapter 5 of the Administrative Procedure Act (APA), 12 U.S.C. § 1786(j)(1), and that judicial review is to be had according to chapter 7 of the APA, 12 U.S.C. § 1786(j)(2). The APA provides that a reviewing court shall set aside

agency action, findings, and conclusions found to be—

---

1. Under 12 C.F.R. § 226.4(c), a loan application fee does not constitute interest if it is charged to all applicants, successful or not. For a time, however, Oiciyapi was charging the fee only to applicants who actually received credit, which made the fee a finance charge. This practice apparently occurred because of a misunderstanding with the NCUA examiner and was corrected once the confusion was cleared up.

2. The Board agreed with Oiciyapi that because any violation of the maximum interest rate regulation was inadvertent and had been corrected, it was not evidence that Oiciyapi's charter should be suspended.

3. The last step in liquidation is canceling the credit union's charter. 12 U.S.C. § 1766(b)(5) (1988).

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law ... [or]

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title....

5 U.S.C. § 706(2) (1988). Because NCUA hearings are formal adjudication subject to §§ 556 and 557, *see* 12 C.F.R. § 747.704(b), § 706(2)(E) applies, as well as § 706(2)(A).

Oiciyapi first challenges the Board's decision under § 706(2)(E), arguing that the Board's findings are not supported by substantial evidence in the record. It then attacks the decision under § 706(2)(A) and on constitutional grounds.

■ The thorough opinions of the ALJ and the NCUA Board amply demonstrate that there is substantial evidence to support their findings. For example, the NCUA presented reports of NCUA examinations over a three-year period showing that the books had been out of balance on numerous occasions. Hence, Oiciyapi's first argument is meritless. Oiciyapi next argues that the Board abused its discretion in refusing to adopt the ALJ's recommended decision. This argument likewise fails. The ALJ's recommended decision is just that and has no binding force. It is considered a part of the record before the Board. 12 C.F.R. § 747.110(b). Congress granted power to the Board, not the ALJ, to make orders with respect to federal credit unions; the NCUA merely designates the ALJ to hear the case, make proposed findings of fact, and recommend a decision. *See* 12 C.F.R. §§ 747.106(a)–(b), 747.110(b). The Board did not overrule the ALJ's findings of fact, but rather agreed with them and based its order on those findings. It substituted its own choice of sanction for the ALJ's because it believed the ALJ's proposed remedy was not supported by his findings of fact. This decision was within the Board's discretion.

■ Oiciyapi next attacks the Board's reliance on Oiciyapi's asserted failure to promote thrift, to establish an effective loan collection program, and to control loan delinquency. It argues that these terms, which are not defined in the statute, regulations, or bylaws, are so vague and overbroad that to base suspension on them is arbitrary, capricious, and a denial of due process. Allowing the Board to take away its charter without supplying objective criteria by which its performance can be measured impermissibly subjects Oiciyapi to the standardless discretion of the NCUA, the credit union argues. Oiciyapi further maintains that since promoting thrift is central to a credit union's mission, the NCUA abused its discretion in failing to promulgate regulations specifying what would constitute satisfactory promotion of thrift. We disagree. An agency may develop standards by adjudication as well as by rulemaking and has substantial discretion to choose which to use in a particular instance. *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974); *North Dakota ex rel. Board of Univ. & School Lands v. Yeutter*, 914 F.2d 1031, 1036–37 (8th Cir. 1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2258, 114 L.Ed.2d 710 (1991). We find no abuse of that discretion here.

■ We also think that the standards the Board used in this case are constitutional and non-arbitrary. The ALJ and the Board determined, by looking at objective data like membership statistics, aggregate savings, and loan delinquency rates, and by comparing Oiciyapi's performance in these areas with that of other similar credit unions, that Oiciyapi was not promoting thrift or collecting loans effectively. We reject Oiciyapi's argument that it did not receive adequate notice of what criteria would be used; the NCUA examination reports contained statistics with peer comparisons, so Oiciyapi knew that its performance might be evaluated against that of other credit unions.

■ Finally, Oiciyapi contends that the sanction imposed on it is arbitrary and capricious because closing the credit union will frustrate rather than further the goals of the FCUA. Section 101 of the FCUA defines a credit union as "a cooperative association ... for the purpose of promoting thrift among its members and creating a source of credit for provident or produc-

tive purposes...." 12 U.S.C. § 1752 (1988). The Federal Credit Union Bylaws contain similar language. Citing *Branch Bank & Trust Co. v. National Credit Union Admin. Bd.*, 786 F.2d 621 (4th Cir.1986), *cert. denied*, 479 U.S. 1063, 107 S.Ct. 948, 93 L.Ed.2d 997 (1987), Oiciyapi argues that the FCUA was passed "to enhance credit availability for people of limited means and collateral." *Id.* at 623. Closing Oiciyapi will cut off all sources of credit for most of its members. While savings may not be at a high level, which is understandable in such an impoverished area, removing the opportunity to save will not help matters. Oiciyapi maintains that the Board struck an improper balance between the needs of the community and the condition of the credit union: since the need for a credit union is so strong and the credit union is both solvent and profitable, it argues, community needs must prevail. Oiciyapi also suggests that when the government is spending billions of dollars to bail out failed savings and loan institutions, it is ironic that the NCUA is closing down Oiciyapi, a tiny credit union that has never cost taxpayers any money at all.

The NCUA argues in response that Oiciyapi is not serving any purpose relevant to the goals of the FCUA, and that the very things that keep Oiciyapi solvent and profitable demonstrate that it fulfills no useful function as a federal credit union. Oiciyapi's primary activity, according to testimony and documents in the record, is granting payday loans. These are loans that are taken out up to two weeks in advance of the borrower's next paycheck. When payday comes, the borrower repays the loan and usually takes out another loan against his or her next paycheck. Since a $10 fee is charged for each payday loan application and over 150 people apply every two weeks, the credit union derives quite a substantial income from this activity. Payday loans are not "credit for provident or productive purposes," as they are not used for investment. Another practice that has helped keep Oiciyapi profitable is not paying dividends to members on their savings.[4] The only dividend payment the record shows is a nominal one of 2% in June 1989. Not paying dividends obviously discourages saving, which is the primary goal of the FCUA. The disincentive effect of this practice is evidenced by an extremely low level of savings, only $12,500 total for all individual members in 1986. The NCUA also argues that the needs of the community should not be given controlling weight when the community is not using the credit union (in 1988, membership was only 1.4% of potential) and when it does not care enough to make sure the credit union is being run properly.

Finally, the NCUA contends that if a credit union is being run in an unsafe and unsound manner, as Oiciyapi was because of its poor recordkeeping and lack of a supervisory committee, among other problems, the NCUA need not wait for fraud or insolvency before closing the credit union down. Given its duty to protect the federal credit union insurance fund, the NCUA argues, it would be irresponsible to risk losses by taking no action.

While liquidation is not necessarily the remedy we would have chosen in the Board's place,[5] we cannot say that the

---

4. Members save by purchasing shares in the credit union. Return on their investment is in the form of dividends, not interest.

5. We are disappointed that the NCUA did not make more of an effort to keep Oiciyapi in operation, given the great need for a credit union on the reservation. The tribe was obviously willing to help, as evidenced by its $11,000 contribution when the credit union was insolvent, yet the NCUA examiner never met with tribal officials to address the chronic problems with the credit union. Periodically, NCUA examiners would ride into town and read the credit union the riot act, but they were apparently unwilling to spend time between examinations showing the obviously inexperienced board of directors and staff how to go about solving the problems.

We also note that the Board specifically rejected the option of placing Oiciyapi into conservatorship pursuant to 12 U.S.C. § 1787(h) because "even with the assistance of NCUA, the credit union's financial condition precluded its remaining open"; yet in a recent case where the credit union involved was not profitable like Oiciyapi but had lost $273,000 in ten months and was rapidly approaching insolvency, the NCUA sought conservatorship, not liquidation.

Board's choice was arbitrary, capricious, or an abuse of the discretion granted to the NCUA by Congress. The remedy the Board chose was within its statutory authority: 12 U.S.C. § 1766(b)(1) authorizes it to suspend, revoke, or liquidate a credit union that "has violated any of the provisions of its charter, its bylaws, this chapter, or any regulations issued thereunder." 12 U.S.C. § 1766(b)(1) (1988). The NCUA correctly points out that an agency's choice of sanction is not a purely legal determination but reflects a policy judgment. In *Butz v. Glover Livestock Comm'n Co.*, 411 U.S. 182, 93 S.Ct., 1455, 36 L.Ed.2d 142 (1973), the Supreme Court said,

> [W]here Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy the relation of remedy to policy is peculiarly a matter for administrative competence.... The fashioning of an appropriate and reasonable remedy is for the [agency], not the court. The court may decide only whether under the pertinent statute and relevant facts, the [agency] made an allowable judgment in [its] choice of the remedy.

*Id.* at 185, 188–89, 93 S.Ct. at 1458, 1459–60. Here, the NCUA's action was expressly authorized by the governing statute and was based on substantial evidence in the record. Because the agency made an allowable judgment that was not an abuse of its discretion, we affirm.

### III.

Because the NCUA Board's decision was supported by substantial evidence and was not arbitrary, capricious, an abuse of discretion, or unconstitutional, we affirm.

---

*See Bingham v. National Credit Union Admin. Bd.*, 927 F.2d 282 (6th Cir.1991), *petition for cert. filed*, 59 U.S.L.W. 3839 (U.S. June 4, 1991) (No. 90–1873).