United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

Nos. 96-3224/3305

_____

| | | |
|---|---|---|
| In Re: Jones Truck Lines, Inc., | * | |
| | * | |
| Debtor. | * | |
| ------------------------------------------------ | * | |
| | * | |
| Jones Truck Lines, Inc., | * | |
| | * | |
| Plaintiff - Appellee/ | * | |
| Cross - Appellant, | * | Appeals from the United States |
| | * | District Court for the |
| v. | * | Western District of Arkansas. |
| | * | |
| Central States, Southeast and Southwest | * | |
| Areas Pension Fund; Central States, | * | |
| Southeast and Southwest Areas Health | * | |
| and Welfare Fund, | * | |
| | * | |
| Defendants - Appellants/ | * | |
| Cross - Appellees. | * | |

_____

Submitted: May 19, 1997
Filed: November 25, 1997

_____

Before BEAM and LOKEN, Circuit Judges, and KYLE,[*] District Judge.

_____

_____

[*]The HONORABLE RICHARD H. KYLE, United States District Judge for the District of Minnesota, sitting by designation.

LOKEN, Circuit Judge.

The Bankruptcy Code allows the trustee in bankruptcy to enhance a debtor's estate by "avoiding" pre-bankruptcy transfers of the debtor's property that conferred an unfair preference on one creditor. Though the concept is quite simple, it is difficult to implement, and the end result is a lengthy, complex statute, 11 U.S.C. § 547. In this case, Jones Truck Lines ("Jones") filed a Chapter 11 liquidating bankruptcy petition and sued to recover as preferential payments nearly $6 million in employee benefit contributions made during the ninety days prior to bankruptcy. After a four-day trial, the bankruptcy court held that the payments were avoidable preferences, the district court affirmed, and the benefit funds appeal. We conclude that the contributions were not avoidable preferences because Jones received contemporaneous new value for them, namely, employee services. Accordingly, we reverse and remand.

## I. Background.

Before its demise, Jones was a large interstate trucking company. Collective bargaining agreements with the International Brotherhood of Teamsters obligated Jones to make pension and health and welfare benefit contributions on behalf of its 2300 union employees to the agreed employee benefit funds, Central States, Southeast and Southwest Areas Health and Welfare Fund, and Central States, Southeast and Southwest Areas Pension Fund (collectively, "Central States"). The funds are non-profit employee benefit trusts, managed by trustees selected by contributing employers and their unions, and governed by ERISA. In early 1991, the time in question, the collective bargaining agreement obligated Jones to contribute $104.70 per covered employee per week to the Health and Welfare Fund, and $16.60 per covered employee per day to the Pension Fund. Jones calculated the amount of contributions owing on a weekly basis, typically by Tuesday of the following week. It sent this information to Central States and paid its contribution obligations once a month. A contribution was considered delinquent if not paid by the fifteenth day of the following month.

Jones failed to make its December 1990 contributions in mid-January 1991. Employee benefit funds have an independent right to enforce the employer's contribution obligations.[1] Exercising that right, Central States threatened Jones with a collection action. The parties negotiated and reached an agreement in principle in early February that was reduced to writing in a May 7, 1991, Participation Agreement. The relevant portion of that agreement was summarized in Recital C:

> As of February 15, 1991, [Jones] owed (i) $1,427,040.68 to the Pension Fund . . . and (ii) $1,458,724.80 to the Welfare Fund for unpaid and accrued health and welfare contributions. [Jones] has agreed to execute and deliver promissory notes (one to each Fund) to evidence the two above-mentioned delinquent contribution accounts (the "Fund Notes"). In addition, [Jones] has agreed to pay, on a current basis, weekly contributions to the Funds in such amounts (which currently approximate $425,000) so that as of the 15th day of each month [Jones] will have fully paid to the Funds [Jones's] contributions under the above-mentioned collective bargaining agreements for the preceding month.

Jones made its first $425,000 payment under this arrangement on February 25, 1991. Weekly payments followed. Jones terminated all union employees and filed for Chapter 11 protection on July 9, 1991. Between April 12 and July 9 -- the ninety days prior to bankruptcy when transfers are presumptively preferential, see § 547(b)(4)(A) -- Jones made thirteen weekly payments totaling $5,684,838.80.[2] Eleven of those payments were for $425,000; two were somewhat larger to cover accumulated shortfalls between the weekly estimates and the actual prior month's contribution obligations. No part of those payments was applied to the Fund Notes, which

---

[1] See generally Schneider Moving & Storage Co. v. Robbins, 466 U.S. 364 (1984); Lewis v. Benedict Coal Corp., 361 U.S. 459 (1960); Central States, S.E. & S.W. Areas Pension Fund v. Gerber Truck Serv., Inc., 870 F.2d 1148 (7th Cir. 1989).

[2] Jones also made interest payments on the Fund Notes during this period. Central States concedes that those payments were avoidable preferences.

represented Jones's past-due contribution obligations as of February 15. The bankruptcy court and the district court nonetheless concluded that Jones may avoid and recover all of the weekly payments under § 547 of the Bankruptcy Code.

## II. A Brief Overview.

Section 547 is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy. See 5 COLLIER ON BANKRUPTCY ¶ 547.01 at p. 547-9 (15th ed. rev. 1997). In general, an avoidable preference is a transfer of the debtor's property, to or for the benefit of a creditor, on account of the debtor's antecedent debt, made less than ninety days before bankruptcy while the debtor is insolvent, that enables the creditor to receive more than it would in a Chapter 7 liquidation. See § 547(b). If a transfer is avoidable under § 547(b), the creditor may escape preference liability by proving that it falls within one of the exceptions set forth in § 547(c). Two of those exceptions are at issue in this case, the contemporaneous new value exception in § 547(c)(1), and the subsequent new value exception in § 547(c)(4). Their purpose is to encourage creditors to continue doing business with troubled debtors who may then be able to avoid bankruptcy altogether.

In February 1991, Jones owed Central States roughly $2.9 million for past-due fund contributions. Central States agreed to defer that debt by converting it to secured promissory notes *and* to continue doing business with Jones if Jones accelerated its current contributions by making estimated weekly payments, rather than paying once a month. Under the bankruptcy court and district court rulings, Central States must now return thirteen weekly payments to Jones's bankruptcy estate. Thus, its decision to continue doing business with a troubled debtor, which § 547 is designed to encourage, has increased Central States's unsecured bankruptcy claim by almost $5.7 million. This outcome is inconsistent with the policies underlying § 547. With that preamble, we turn to the specific statutory provisions at issue.

-4-

### III.  The Contemporaneous New Value Exchange Exception.

Contemporaneous new value exchanges are not preferential because they encourage creditors to deal with troubled debtors *and* because other creditors are not adversely affected if the debtor's estate receives new value.  See Pine Top Ins. Co. v. Bank of Amer. Nat'l Trust & Sav. Ass'n, 969 F.2d 321, 324 (7th Cir. 1992).  To qualify for this exception, a creditor must prove that an otherwise preferential transfer was "(A) intended by the debtor and the creditor . . . to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange." § 547(c)(1).  The bankruptcy court and the district court held that § 547(c)(1) does not apply in this case because the Central States benefit funds did not provide new value "directly to the debtor."  We reject this construction of the statute.

**A.  New Value.**  "New value" for § 547(c) purposes includes "money or money's worth in goods, services, or new credit."  § 547(a)(2).  The flaw in the district court's analysis was its search for new value flowing from Central States to Jones.  An employer pays wages and benefits in exchange for employee services.  That is true even if wages and benefits are collectively bargained, and even if the parties to a collective bargaining agreement designate a third party benefit fund to receive, invest, and pay out benefits on behalf of the employees.  The "new value" Jones received for paying current wages and benefit contributions during the ninety-day preference period were the services its employees continued to provide.

Recognizing that the new value came from Jones's employees, not their benefit funds, exposes the flaw in Jones's contention that Central States merely refrained from terminating fund benefits in exchange for the weekly payments.  While such forbearance is usually not new value, the question here is not what Central States did, but whether the weekly payments were for current or past-due employee services.  To illustrate, assume that an employer fails to pay an employee's salary and benefits when due.  The employee complains and threatens to resign, or his union threatens to strike.

If the employer responds by paying (or providing collateral for) the past-due salary or benefits, that transfer is not for new value. See In re Elton Trucking, Inc., 1996 WL 261059 (Bankr. N.D. Ill. 1996); In re Burner Servs. & Combustion Controls Co., 1989 WL 126487 (Bankr. D. Minn. 1989).[3] If the employer also resumes paying the employee's current salary and benefits when due, and the employee keeps working, those current payments are contemporaneous exchanges for "new value," the employee's continuing services. In our view, this new value analysis is the same whether the creditor claiming § 547(c)(1) protection is the employee who continued to work in exchange for current wages, or the employee benefit fund to which current benefits were paid on the employee's behalf.

Like the bankruptcy court and the district court, Jones sidesteps this reality by relying on cases that have construed the phrase "new value given to the debtor" in § 547(c)(1)(A) as meaning only new value given *directly* to the debtor by the creditor, in this case Central States. See In re Bowers-Siemon Chems. Co., 139 B.R. 436, 448-49 (Bankr. N.D. Ill. 1992); In re H & S Transp. Co., 80 B.R. 441, 447 (Bankr. M.D. Tenn. 1987), rev'd on other grounds, 90 B.R. 309 (M.D. Tenn. 1988). But this construction of the statute radically alters its plain meaning by inserting a word, "directly," that Congress omitted. There are countless transactions in which a debtor transfers property to a creditor in exchange for contemporaneous new value provided "to the debtor" by a third party. Jones counters with a textual argument, that § 547(c)(1) refers to "new value *given to* the debtor," whereas the exception in § 547(c)(4) uses a broader phrase, "new value to *or for the benefit of* the debtor." See In re Bellanca Aircraft Corp, 850 F.2d 1275, 1280 (8th Cir. 1988), construing § 547(c)(4). This textual argument is unpersuasive. Section 547(c)(1) applies to "a contemporaneous *exchange for new value*," language whose ordinary meaning would

---

[3]On this ground, we agree with the decision in In re Broderick Co., 177 B.R. 430, 436 (Bankr. D. Mass. 1995). We disagree with the court's alternative ground that debtor did not receive new value *from* the employee benefit trust.

include exchanges involving more than two parties. Section 547(c)(4), on the other hand, applies if the "*creditor gave new value*," a phrase to which "for the benefit of" must be added to clarify that three-party exchanges are included. Thus, we agree with the other circuits that have concluded that a transfer of new value by a third party to the debtor may satisfy the "new value" requirement of § 547(c)(1)(A). See In re Kumar Bavishi & Assocs., 906 F.2d 942, 945 (3d Cir. 1990); In re E.R. Fegert, Inc., 887 F.2d 955, 959 (9th Cir. 1989); In re Fuel Oil Supply & Terminaling, Inc., 837 F.2d 224, 228-30 (5th Cir. 1988).[4]

**B. Contemporaneous Exchanges.** There remain two § 547(c)(1) issues that the bankruptcy court and the district court did not reach, whether the parties intended a contemporaneous exchange, and whether the exchange was in fact substantially contemporaneous. The Jones/Central States Participation Agreement expressly provided that past-due contributions would be reduced to secured promissory notes, and that Jones would continue to pay current contribution obligations on an accelerated weekly basis. Thereafter, weekly estimated payments were made and later adjusted so that they equalled Jones's current contribution obligations. Those payments were in fact paid as contemporaneously as contributions paid before Jones encountered financial difficulty. Jones does not challenge this uncontroverted evidence that the parties intended a contemporaneous exchange, nor does Jones contend that the benefit payments were not in fact substantially contemporaneous with the employee services for which they were exchanged. Although these are issues of fact, see In re Lewellyn

---

[4]Jones also argues that Central States failed to quantify the "new value" that Jones received, relying on cases such as In re Southern Technical College, 89 F.3d 1381, 1385 (8th Cir. 1996). We disagree. Absent contrary evidence, the value of employee services is presumed to equal the wages and benefits the employer contracted to pay. See In re Pulaski Highway Express, Inc., 57 B.R. 502, 510 (Bankr. M.D. Tenn. 1986). It would not encourage employees to stick with a troubled business if their current wages and benefits could later be attacked as preferential on the ground that their labor was not worth what the employer agreed to pay.

& Co., 929 F.2d 424, 427 (8th Cir. 1991), we conclude on this record that Central States has established as a matter of law that the transfers were intended to be contemporaneous and were in fact substantially contemporaneous.

### IV. Other Issues.

For the foregoing reasons, we conclude that Jones may not avoid the thirteen weekly payments in question because they were contemporaneous exchanges for new value within the meaning of § 547(c)(1). As we understand the record, this decision effectively resolves the matters contested on appeal, so that the bankruptcy court on remand must simply reduce Central States's preference liability to uncontested amounts such as interest paid on the Fund Notes during the ninety-day preference period. However, because the case may be more complex than we realize, and because the other issues presented on appeal may well have significance in future cases, we will comment briefly on those issues.

**A. The Subsequent New Value Exception.** Central States argues that the weekly payments also escape preference liability under the "subsequent new value" exception, § 547(c)(4), which provides that a trustee may not avoid a transfer

> (4) to or for the benefit of a creditor, to the extent that, after such a transfer, such creditor gave new value to or for the benefit of the debtor --
>
> > (A) not secured by an otherwise unavoidable security interest; and
> >
> > (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

Like § 547(c)(1), § 547(c)(4) "seeks to encourage creditors to deal with troubled businesses in the hope of rehabilitation." In re Kroh Bros. Dev. Co., 930 F.2d 648, 651 (8th Cir. 1991).

For Central States to need the § 547(c)(4) exception, we must assume (contrary to our decision in Part III) that the § 547(c)(1) contemporaneous new value exception does not apply. If Jones received no contemporaneous new value for the weekly payments, then it necessarily received subsequent new value for each payment (except the last one) because its employees continued working. In Kroh Brothers, we observed that "section 547(c)(4) is not available to a creditor to the extent the creditor has received payment from the debtor for the goods or services constituting new value." 930 F.2d at 653. Applying that principle, the district court concluded that any subsequent new value Central States provided was in turn fully paid by Jones's subsequent weekly payments. But the court also concluded that those offsetting payments to Central States were themselves avoidable preferences. On appeal, Central States argues that the court misconstrued § 547(c)(4) because subsequent new value cannot be offset or nullified by payments that are themselves avoidable preferences.

Section 547(c)(4)(B) defines subsequent new value as value not offset by "an *otherwise unavoidable* transfer" to the creditor. Here, Central States received weekly payments made after employees provided subsequent new value, but those payments were "otherwise *avoidable*" and therefore cannot deprive Central States of § 547(c)(4) protection. As the court said in In re Maxwell Newspapers, Inc., 192 B.R. 633, 639 (Bankr. S.D.N.Y. 1996), "There is no logical reason to distinguish between a creditor that was paid by an avoidable transfer and one that was never paid at all." Accord Countryman, The Concept of a Voidable Preference in Bankruptcy, 38 Vand.L.Rev. 713, 788 (1985).

Conceding that its ruling was contrary to the language of § 547(c)(4), the district court nonetheless considered itself bound by Kroh Brothers. However, the issue in Kroh Brothers was whether pre-petition payments to the creditor by another creditor should offset subsequent new value to the debtor. We held that such payments must be counted in the § 547(c)(4) new value equation; otherwise, the creditor would be in a better position than if the original preference had not occurred. See 930 F.2d at 653.

Thus, Kroh Brothers did not involve the timing question in this case -- whether pre-petition payments to a creditor that are avoided after bankruptcy commences should offset that creditor's subsequent new value. Given the context of our decision in Kroh Brothers, we agree with courts that have construed our reference to "remaining unpaid" as "an adequate shorthand description of § 547(c)(4)(B)." In re Toyota of Jefferson, Inc., 14 F.3d 1088, 1093 n.2 (5th Cir. 1994); see In re IRFM, Inc., 52 F.3d 228, 231 (9th Cir. 1995). Under the plain language of § 547(c)(4)(B), Jones's "otherwise avoidable" payments did not deprive Central States of § 547(c)(4) protection.

**B. Antecedent Debt.** A transfer is not an avoidable preference unless it is "for or on account of an antecedent debt." § 547(b)(2). A debt is "antecedent" if it was incurred before the allegedly preferential transfer. A debt is incurred "on the date upon which the debtor first becomes legally bound to pay." In re Iowa Premium Service Co., 695 F.2d 1109, 1111 (8th Cir. 1982) (en banc) ("IPSCO").

Applying this standard, the bankruptcy court and the district court concluded that each weekly contribution payment was for an antecedent debt because Jones became obligated to pay pension and welfare benefits on a weekly basis under the applicable collective bargaining agreements, and the payments were made thereafter. Central States -- supported by the National Coordinating Committee for Multiemployer Plans as *amicus curiae* -- argues that this application of § 547(b)(2) threatens ERISA benefit plans with unfair preference liability. Because these employee benefit obligations are continuously accruing and can only as a practical matter be calculated and paid on a periodic basis, Central States argues that they are not for antecedent debts if they are paid within a commercially reasonable time after the employees' services.

This is a difficult issue, and there is precedent on both sides. On the one hand, In re Emerald Oil Co., 695 F.2d 833, 837 (5th Cir. 1983), and our decision in IPSCO, 695 F.2d at 1112, support the district court's analysis and rest on the logical premise that a debtor first becomes liable when a resource is consumed or a service performed,

-10-

not when the creditor chooses to bill the debtor.  Accord <u>In re Cybermech, Inc.</u>, 13 F.3d 818, 822 (4th Cir. 1994).  But in <u>IPSCO</u>, the result was to delay when bank debt was incurred, which gave the bank creditor the benefit of the "ordinary course of business" exception in § 547(c)(2).  In a case such as this, on the other hand, literal application of the <u>IPSCO</u> standard accelerates the date that a continuously accruing debt is incurred.  The result is that some debts will be labelled "antecedent" even though they were paid as quickly as the obligations could be calculated.  For this reason, other courts have concluded that continuously accruing obligations such as rent and insurance premiums are not incurred until they are owing under the contract.  <u>See</u> <u>In re White River Corp.</u>, 799 F.2d 631, 633 (10th Cir. 1986); <u>In re Advance Glove Mfg. Co.</u>, 761 F.2d 249, 252 (6th Cir. 1985).

This § 547(b)(2) issue will not be as important as Central States suggests if the exceptions in § 547(c) protect employee benefit plans that should avoid preference liability.  Because Central States prevails under the § 547(c)(1) exception, we will leave the antecedent debt question unresolved.

**C. The § 1113(f) Issue.**  <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 513 (1984), held that a collective bargaining agreement is an executory contract that a Chapter 11 debtor-in-possession may reject under § 365(a) of the Code.  Congress promptly overruled this decision by enacting 11 U.S.C. § 1113(f), which provides:

> (f) No provision of this title shall be construed to permit a trustee to unilaterally terminate or alter any provisions of a collective bargaining agreement prior to compliance with the provisions of this title.

Central States argues that the district court violated § 1113(f) by permitting Jones to unilaterally alter its collective bargaining agreement by recovering as a preference money paid to Central States for work performed before bankruptcy.  Like the bankruptcy court and the district court, we disagree.

Section 1113(f) was designed to prevent employers "from using bankruptcy as an offensive weapon to rid themselves of burdensome collective bargaining agreements." In re Ionosphere Clubs, Inc., 22 F.3d 403, 408 (2d Cir. 1994). That refers to post-petition conduct by the debtor in a Chapter 11 reorganization. By contrast, the trustee for a liquidating debtor who sues to recover avoidable preferences is not attempting "to unilaterally terminate or alter" the debtor's collective bargaining agreement. It is attempting to marshall the debtor's assets for equitable distribution to all creditors in accordance with the Bankruptcy Code. Other circuits have concluded that § 1113(f) does not supersede the claims priority provisions contained in § 507 of the Code. See Ionosphere Clubs, 22 F.3d at 407-08; In re Roth American, Inc., 975 F.2d 949, 954-58 (3d Cir. 1992). Similarly, "there is nothing to indicate that Congress intended to exempt employer obligations under a collective bargaining agreement from potential preference liability." In re Sterling Die Casting Co., 118 B.R. 205, 208 (Bankr. E.D.N.Y. 1990). We conclude that § 1113(f) does not supersede the avoidable preference provisions of § 547.

The judgment of the district court is reversed and the case is remanded with instructions to remand to the bankruptcy court for recalculation of Central States's preference liability in accordance with this opinion.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

-12-