# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

Nos. 01-1949/2011

_____

In re: Murray F. Armstrong,                \*
                                    \*

            Debtor.           \*
                                    \*
_____        \*

Harrah's Tunica Corporation,      \*
d/b/a Harrah's Casino Cruises-Tunica,  \*
                                    \*

        Appellant/Cross Appellee,  \*
                                    \*  Appeals from the United States
      v.                      \*  District Court for the
                                    \*  Eastern District Arkansas.
William S. Meeks, Trustee,       \*
                                    \*

        Appellee/Cross Appellant.  \*

_____

Submitted: December 13, 2001

Filed: May 29, 2002

_____

Before MORRIS SHEPARD ARNOLD, BEAM, and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

     William S. Meeks (Meeks or the trustee) initiated this adversary proceeding in the bankruptcy court to avoid preferential transfers from the debtor, Murray F. Armstrong (Armstrong), to Harrah's Tunica Corporation (Harrah's) under 11 U.S.C.

§§ 547, 548(a)(1), and Arkansas Code § 16-118-103.  Harrah's appeals the decision of the district court[1] which affirmed the bankruptcy court's[2] decision for the trustee. We affirm.

## I.    BACKGROUND

Armstrong, the debtor, is an Arkansas attorney who organized Ponzi schemes[3] to defraud investors, embezzled funds from his elderly clients' life savings to support his fraud, and then attempted to become solvent through check kiting[4] and gambling. He is currently incarcerated in a state penitentiary serving a 156-year sentence for his crimes.  On January 30, 1996, an involuntary bankruptcy petition was filed with the bankruptcy court and an order for relief was entered on March 13, 1996.  Meeks was appointed trustee in the bankruptcy proceeding.  Harrah's is the operator of Harrah's Casino Cruises in Tunica, Mississippi.

---

[1]The Honorable George Howard, Jr., United States District Judge for the Eastern District of Arkansas.

[2]The Honorable Mary Davies Scott, United States Bankruptcy Judge for the Eastern District of Arkansas.

[3]Ponzi schemes are fraudulent business ventures in which investors' "returns" are generated by capital from new investors rather than the success of the underlying business venture.  This results in a snowball effect as the creator of the Ponzi scheme must then recruit even more investors to perpetuate the fraud.  See generally United States v. Mathison, 157 F.3d 541, 546 (8th Cir. 1998) (upholding convictions for the operation of a Ponzi scheme).

[4]The scheme involves the systematic deposit of insufficient funds checks into one or more bank accounts, causing the bank balance to reflect an inflated increase without actual funds to cover the check.  See generally United States v. Whitehead, 176 F.3d 1030, 1034 (8th Cir. 1999) (discussing check kiting as basis for fraud conviction).

In the early 1990's, Armstrong was in a very bad financial position, earning less from his legal practice than was required to finance his expensive lifestyle. Finding his income insufficient for his spending habits, Armstrong began organizing Ponzi schemes, embezzling the life savings of elderly clients, check kiting and gambling heavily.

On the night of October 12, 1995, Armstrong made a gambling trip to Harrah's in Robinsville, Mississippi, that lasted into October 13. Armstrong signed a "Casino Credit Application" in order to obtain markers from Harrah's. The Casino Credit Application gave Harrah's authorization to investigate Armstrong's financial history "for the approval of [his] credit limit." The credit application also noted in bold type that "APPLICANT IS RESPONSIBLE FOR PAYMENT OF CREDIT ISSUED." Armstrong requested on the application a fourteen day "disposition," or holding time, before Harrah's would deposit the markers for payment from Armstrong's checking account. After looking into Armstrong's credit and his background with other casinos, Harrah's initially granted him a $20,000 line of credit, and then later on October 13, increased this line of credit to $50,000. During this two-day period, Harrah's allowed Armstrong to sign twenty-six markers totaling $50,000. Armstrong received $50,000 in gambling chips from the casino in return for the markers.

Harrah's at first agreed to hold the markers for fourteen days before depositing them for payment from Armstrong's bank account. Harrah's later extended this time to thirty days, the maximum period that Harrah's would hold a marker. Harrah's policy, in line with casino industry standards, was to hold the markers for the agreed upon "disposition," here fourteen and then thirty days, before depositing the markers at the customer's bank. Also under its policy, markers could be repaid in chips or cash before the borrower left the casino, or in the alternative, the casino would send the markers to the bank and the bank would honor the markers. Harrah's policy was

to deposit immediately all personal or payroll checks paid to the casino. During his October 12 and 13 gambling trip, Armstrong lost $48,400 gambling at Harrah's.

After holding the markers for thirty days, Harrah's deposited them on November 12 and 13, 1995. The markers were presented for payment on November 14, 1995 from Armstrong's farm account at the Bank of Rison in Rison, Arkansas. On that date, Armstrong had insufficient funds in his farm account to pay off the markers. The bank held the markers for a day to allow Armstrong to come up with the funds. Armstrong then fraudulently secured a loan for $65,000 from the Warren Bank and Trust Company using a fictitious lumber deed as collateral and deposited the funds in his farm account. The Bank of Rison then paid the markers on November 15 and 16, 1995.

Returning to Harrah's on November 15 and 16, 1995, Armstrong signed eight more markers that were redeemed with chips during that trip and are not the subject of this litigation. On December 15, 1995, Armstrong gambled again at Harrah's and signed an additional thirteen markers worth $50,000 that remain unpaid. Only the October 12 and 13 markers are the subject of this proceeding. The trustee seeks to avoid the payment on these October markers.

Armstrong was insolvent throughout all of the relevant time period, with his financial obligations exceeding his assets by a net deficit of $1,596,483 in October, 1995.

## II.    DISCUSSION

Following the district court's review of the decision of the bankruptcy court, we sit as a second court of review in this matter. Owens v. Miller (In re Miller), 276 F.3d 424, 428 (8th Cir. 2002). We apply the same standard of review as the district court, reviewing the bankruptcy court's findings of fact for clear error and the bankruptcy court's conclusions of law de novo. Id.

-4-

The trustee's cause of action to avoid the transfer of $50,000 from Armstrong to Harrah's is based upon a preference under 11 U.S.C. § 547(b). In order to establish a prima facie case for a preference under the statute, the trustee must establish an interest:

> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made –
>> (A) on or within 90 days before the date of the filing of the petition; or
>> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if –
>> (A) the case were a case under chapter 7 of this title;
>> (B) the transfer had not been made; and
>> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Id. It is undisputed that the trustee presented sufficient evidence on all of the elements of § 547(b), except for subsection (2). Harrah's argues the trustee did not make a prima facie case for a preference because he did not prove under § 547(b)(2) that the transfer was "for or on account of an antecedent debt owed by the debtor before such transfer was made."

### A.    Antecedent Debt

Harrah's argues the casino markers at issue are negotiable instruments – "checks" made out by Armstrong in a concurrent transaction for gambling chips. The bankruptcy court, however, concluded the markers were part of a loan transaction and thus met the antecedent debt element.

The Bankruptcy Code defines "debt" as a "liability on a claim." Laws v. United Mo. Bank of Kansas City, N.A., 98 F.3d 1047, 1049 (8th Cir. 1996) (citing 11 U.S.C. § 101(12)). "A debt is 'antecedent' if it was incurred before the allegedly preferential transfer." Jones Truck Lines, Inc. v. Cent. States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.), 130 F.3d 323, 329 (8th Cir. 1997). "A debt is incurred 'on the date upon which the debtor first becomes legally bound to pay.'" Id. (quoting In re Iowa Premium Serv., Co., 695 F.2d 1109, 1111 (8th Cir. 1982) (en banc)). Here, it is clear Armstrong became obligated to pay on October 12 and 13. The issue is whether Armstrong simultaneously paid for the $50,000 of chips at that time.

The bankruptcy court and district court both relied upon our decision in United States v. Abodeely, 801 F.2d 1020, 1022 (8th Cir. 1986), a criminal tax evasion case, in which we stated that "[a] marker is an advance or loan which may be exchanged . . . for chips in order to gamble." Harrah's argues this was mere dicta and not binding precedent upon this court. While we were correct in Abodeely that a marker is a short term loan exchanged for gambling chips, a more in-depth analysis is warranted here.

The legal definition of a casino marker is a crucial factor in determining the rights of the parties. Harrah's argues a marker meets the statutory definition of a check under the Mississippi Uniform Commercial Code. Each marker states on its face that it is governed by the laws of Mississippi. The Uniform Commercial Code (UCC) as adopted by Mississippi defines a check as "(i) a draft, other than a documentary draft, payable on demand and drawn on a bank or (ii) a cashier's check or a teller's check." Miss. Code Ann. § 75-3-104(f). Each marker states on its face: the name of the drawee, the amount of money, the date of issue, the signature of Murray Armstrong, the bank it is to be drawn from, and the bank account number. The markers also read, "I hereby represent that I have received cash for the above amount and that said amount is on deposit in said institution in my name and is free

from claims and is subject to this check." Upon presentment to the bank for payment, the markers at issue legally operate as checks under the UCC. However, this does not end our analysis.

With the expanding legalization of gambling and the pervasiveness of casino business operations almost nationwide, other courts have been called upon to analyze the legal effect of markers. Louisiana and Nevada have both concluded that a marker falls within the definition of a check under the UCC and markers are therefore enforceable under state bad check criminal enforcement laws. TeleRecovery of Louisiana, Inc. v. Gaulon, 738 So. 2d 662, 666-67 (La. Ct. App. 1999); Nguyen v. State, 14 P.3d 515, 518 (Nev. 2000). See also Fleeger v. Bell, 95 F. Supp. 2d 1126, 1131 (D. Nev. 2000), aff'd Fleeger v. Bell, 2001 WL 1491252 (9th Cir. 2001) (unpublished opinion). While the analysis of markers under the UCC employed by these courts informs us how these states have decided to enforce markers as checks within ordinary banking channels, these cases offer us limited guidance for the facts and issues here.

Harrah's urges this court to conclude that because the markers operate as checks within the normal banking channels and meet the definition of a check under the UCC, the transactions at issue cannot be characterized as involving antecedent debt under § 547(b)(2). Harrah's instead labels the transaction "concurrent," wherein the casino merely exchanged casino chips for Armstrong's markers, which they ask us to treat as the equivalent of personal checks. Harrah's characterization of the transaction at issue ignores important facts.

Harrah's argument mistakenly relies on the assumption that a check cannot form part of a debt transaction. This is not the case. UCC § 3-117 states "the obligation of a party to an instrument to pay the instrument may be modified, supplemented, or nullified by a separate agreement of the obligor and a person

-7-

entitled to enforce the instrument, if the instrument is issued or the obligation is incurred in reliance on the agreement or as part of the same transaction giving rise to the agreement." Miss. Code Ann. § 75-3-117. Comment 1 elaborates upon this rule, noting the separate agreement modifying the terms of the instrument may "contradict[] the terms of the instrument." In this case, each marker is subject to Harrah's further agreement to hold the marker for a period of time.

The record clearly shows that Harrah's agreed to hold the markers initially for fourteen days, and then thirty days, before submitting them to Armstrong's bank for payment. When Harrah's extended a line of credit to Armstrong, permitted him to sign markers in exchange for chips, and promised not to present the markers to his bank for payment for a definite length of time, Harrah's made a short term loan to Armstrong. At that time, on October 12 and 13, Armstrong created a debt to Harrah's not due for thirty days.

It is noteworthy that Harrah's policy requires the immediate deposit of personal checks written or paychecks signed over to the casino for chips; whereas, the casino will hold for later presentment the markers it issues as a part of the "Casino Credit" arrangement. Harrah's credit application signed by Armstrong authorized investigation into Armstrong's financial history "for the approval of [his] credit limit." In bold type on the application was the phrase "APPLICANT IS RESPONSIBLE FOR PAYMENT OF CREDIT ISSUED." This language is evidence that Harrah's recognized that the use of markers and its agreement to hold those markers for up to 30 days was a short-term credit transaction.

In determining that the markers issued by Harrah's were part of a loan transaction, we also note the markers were issued in the precise manner required for "Credit Play" under section VII(T) of the Mississippi Gaming Regulations. These same regulations explicitly refer to markers as "credit instruments."

-8-

An analogy between the markers issued by Harrah's and short term "payday loans" is enlightening as to why the markers here form part of a loan transaction.  In Oiciyapi Fed. Credit Union v. Nat'l. Credit Union Admin., 936 F.2d 1007, 1011 (8th Cir. 1991), we characterized payday loans as "loans taken out up to two weeks in advance of the borrower's next paycheck."  "Payday loans" are an extension of "short-term credit designed to be repaid on the borrower's next payday."  Jackson v. American Loan Co., 202 F.3d 911, 912 (7th Cir. 2000).  The similarity between the payday loan and the casino marker lies in the fact that both loan transactions utilize a negotiable instrument in the name of the borrower that is held for later deposit or redemption in exchange for ready funds.  The payday lender typically holds the borrower's postdated check until "payday," when it is either redeemed by the borrower with cash or presented to the borrower's bank for payment.  Oiciyapi, 936 F.2d at 1011. Similarly, in the marker context, the casino agrees to hold the gambler's signed marker for a specified period of time, here thirty days, before presenting it to the borrower's bank.  In both circumstances, it is the agreement not to deposit the check until a certain date that converts a negotiable instrument into a loan.  The check and the marker in both circumstances function as security for the loan and will only be cashed if the loan is not paid off in the designated time period.

Armstrong's debt to Harrah's here was incurred on October 12 and 13, 1995. The payment on the debt was not due until the agreed upon time when the marker could be deposited at the bank, thirty days later.  Because the debt here was incurred thirty days before payment, we find the payment of the casino markers constituted the payment of antecedent debt for purposes of 11 U.S.C. § 547 (b).  See In re Jones, 130 F.3d at 329.

### B.    Contemporaneous Exchange

A payment that is a preference under § 547(b) may remain unavoided if it falls within one of the Bankruptcy Code's § 547(c) exceptions.  Harrah's first argues the

transaction falls under the affirmative defense set forth in 11 U.S.C. § 547(c)(1). Under the § 547(c)(1) defense, the trustee may not avoid a transfer:

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
(B) in fact a substantially contemporaneous exchange;

Harrah's asks this court to construe the transaction between Harrah's and Armstrong as a concurrent exchange of a payment by check for gambling chips. Harrah's characterization overlooks important aspects of the relevant loan transaction.

To establish the contemporaneous exchange defense, Harrah's must show that: (1) both the Creditor-Harrah's and the Debtor-Armstrong intended a contemporaneous exchange; (2) the exchange was in fact contemporaneous; and (3) the exchange was for new value. See Official Plan Comm. v. Expeditors Int'l of Washington, Inc. (In re Gateway Pac. Corp.), 153 F.3d 915, 918 (8th Cir. 1998).

"The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange." Id. (internal citations omitted). The existence of such an intent is a question of fact that we review for clear error. Id. Here, the bankruptcy court found, "there is no evidence before the Court that either Harrah's or Armstrong intended the transaction to be contemporaneous." Meeks v. Harrah's Tunica Corp. (In re Armstrong), 231 B.R. 723, 729 (Bankr. E.D. Ark. 1999). The bankruptcy court was not clearly erroneous in finding Armstrong initially requested and Harrah's agreed to fourteen days for Armstrong to pay for the markers, which Harrah's later agreed to extend to thirty days. The bankruptcy court therefore made no error in concluding the parties did not intend a contemporaneous exchange for new value.

"The test for when a debt is incurred is whether the debtor is legally obligated to pay." Laws, 98 F.3d at 1051. When a bank made advances to its customer in the amount of checks on deposit not yet collected, we held the customer was not indebted to the bank. Id. However, we importantly noted, if the customer and the bank "explicitly agreed to convert future negative collected funds balances into loans, [the customer] would have been legally bound to pay such debts as incurred." Id. at 1052. Here, the facts show that Harrah's and Armstrong entered into an explicit agreement that Harrah's would not cash the markers for thirty days. Armstrong had the option of redeeming the markers for chips, cash, or check at any time before the markers became due. The debt was incurred at the time Armstrong signed the markers, but the short term loan did not become due until the thirty days expired.

We cannot overlook the important policy considerations driving Congress to structure § 547 as it did. We have previously recognized that "[s]ection 547 is intended to discourage creditors from racing to dismember a debtor sliding into bankruptcy and to promote equality of distribution to creditors in bankruptcy." In re Jones, 130 F.3d at 326. The purpose of the § 547(c) exceptions at issue is "to encourage creditors to continue doing business with troubled debtors who may then be able to avoid bankruptcy altogether." Id. Contemporaneous exchanges for new value are an exception for two reasons: (1) because they encourage creditors to deal with troubled debtors and (2) because other creditors are not adversely affected if the debtor's estate receives new value. Id.

Harrah's has not convinced us that these policy concerns will be met by encouraging casinos to issue credit to troubled debtors so they may, with the odds against them, gamble away their remaining assets and increase their debt. A far better policy would be to discourage casinos from issuing credit to insolvent individuals like Armstrong. As Harrah's is well aware, the odds are clearly stacked against the troubled debtor regaining financial stability by gambling on credit in a casino.

## C.    New Value

Harrah's also argues the "new value" defenses apply to the marker transactions at issue.  As stated previously, one requirement of the § 547(c)(1) exception is that the substantially contemporaneous exchange be for new value.  A separate new value exception is found in § 547(c)(4), which applies when the creditor gives new value to the debtor after the transfer.  New value is defined in § 547(a)(2) as "money or money's worth in goods, services, or new credit."  Harrah's did not establish that it extended new value to Armstrong either contemporaneous to or subsequent to the time Armstrong incurred the debt.  The bankruptcy court correctly determined Harrah's did not meet the "new value" element of the test under either § 547(c)(1) or (4), as no new value was given.

When Armstrong purchased $50,000 worth of gambling chips with markers, he purchased $50,000 worth of entertainment at Harrah's.  Armstrong did not receive "value" as contemplated by the Bankruptcy Code upon his receipt of gambling chips, either on October 12 and 13 or on December 15.  Not until gambling chips are cashed in for valuable currency usable outside of the casino could Armstrong receive "value" as contemplated by § 547(c)(1) or § 547(c)(4).

Harrah's argues that when on December 15 it provided Armstrong with $50,000 in chips in exchange for markers, it provided subsequent new value as contemplated under § 547(c)(4).  However, the October 12 and 13 transaction and the December 15 transaction were distinct and legally unrelated events.  The October 12 and 13 short term loan was paid in full when Harrah's redeemed the markers from Armstrong's bank account on November 15 and 16.  The loan Harrah's extended to Armstrong on December 15 was unrelated.

Moreover, our inquiry under § 547(c)(4) is "whether the new value replenishes the estate." Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs, (In re Kroh Bros. Dev.), 930 F.2d 648, 652 (8th Cir. 1991). The new loan on December 15 which permitted Armstrong to purchase another $50,000 in chips did not replenish the estate, it diminished the estate. The gambling debts incurred on December 15 could only put Harrah's in a better position than other creditors if termed new value. The rule of law Harrah's asks us to adopt would encourage casinos to extend credit to troubled debtors so they might gamble, and more than likely lose money, thus diminishing the bankruptcy estate to the detriment of all other creditors. The policy driving this exception asks whether the creditor depleted the bankruptcy estate to the disadvantage of the other creditors. Id. Harrah's significantly depleted the bankruptcy estate to the detriment of the other creditors. The § 547(c)(4) exception does not apply.

## D.     Ordinary Course of Business

Harrah's next argues avoidance can be prevented under § 547(c)(2) as a transfer:

> (A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;
> (B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and
> (C) made according to ordinary business terms;

To prevail on the ordinary course of business defense, Harrah's is required to show all three statutory elements of the test by a preponderance of the evidence. In re Gateway Pac. Corp., 153 F.3d at 917. As no "precise legal test which can be applied" exists, the court must engage in a "peculiarly factual analysis." Id. (internal citations omitted).

We must also be cognizant of the policy background framing the ordinary business exception as we consider whether the facts here meet all three elements of the statutory test. Like the other § 547(c) exceptions, the policies underlying the ordinary business exception are two-fold: (1) to encourage creditors to continue dealing with troubled debtors, and (2) to promote equality of distribution. Union Bank v. Wolas (In re ZZZZ Best Co.), 502 U.S. 151, 161 (1991). The ordinary business exception fits within the § 547 policy by striving "to leave undisturbed normal financial relations." Central Hardware Co. v. Sherwin-Williams Co. (In re Spirit Holding Co.), 153 F.3d 902, 904 (8th Cir. 1998) (internal quotations omitted). We must construe this exception narrowly, because it places one creditor on better footing than all other creditors. See Jobin v. McKay (In re M & L Bus. Mach. Co.), 84 F.3d 1330, 1339 (10th Cir. 1996).

The first element of the exception requires that Harrah's prove the transfer was in payment of a debt incurred in the ordinary course of business terms or financial affairs of the debtor and the transferee. The bankruptcy court opined that while Harrah's presented evidence that the transfer fell within the ordinary course of the casino's financial affairs and typical casino terms, there was no evidence presented that the transfer was within the ordinary course of the debtor's financial affairs. The bankruptcy court reasoned that "gambling by a nonprofessional does not qualify under the concept of ordinary business or financial affairs." In re Armstrong, 231 B.R. at 730. Harrah's does not present us with any convincing argument establishing that this transaction was within the ordinary course of Armstrong's business affairs. Harrah's instead argues that every transaction between a business and a consumer can fall within the exception, not simply transactions between a business and professionals. Harrah's argument misses the logic of the bankruptcy court's analysis.

Our analysis turns upon whether or not the marker transaction was within "the ordinary course of business terms or financial affairs" of Armstrong and

Harrah's.11U.S.C. § 547(c)(2)(A). That Armstrong was not a professional gambler is certainly a probative fact to take into account in assessing whether or not the transaction was within his ordinary business affairs, but it is not dispositive. More important here is that Armstrong's purpose for gambling, other than entertainment, was to cover huge losses arising from Armstrong's fraud, embezzlement, and Ponzi schemes. As we stated in In re Spirit Holding, Co. the ordinary course of business exception attempts to preserve "normal financial relations." 153 F.3d at 904. We decline to hold that a desperate debtor's irresponsible accumulation of gambling debts in an ill-fated attempt to cover fraud and embezzlement losses qualifies as the ordinary course of his business or financial affairs.

Viewed in the light most favorable to Harrah's, lest we forget, casino gambling is essentially entertainment for the gambler. Casino gambling is neither a necessity of life nor an endeavor in which the typical gambler garners income or acquires goods in the ordinary course of business or financial affairs.

Harrah's is required to prove all three elements of the statutory test in order to establish this defense. As Harrah's did not prove the first element of the ordinary course of business defense, we conclude this transaction does not fall within the exception without reaching the last two elements of the test. We decline to unnecessarily repeat the bankruptcy court's more than adequate rationale for determining this transaction was not "made in the ordinary course of business or financial affairs of the debtor and the transferee" though possibly "made according to ordinary business terms." See In re Armstrong, 231 B.R. at 729-32; 11 U.S.C. § 547(c)(2) (B) and (C).

## E. Prejudgment Interest

The trustee cross-appeals the bankruptcy court's discretionary determination not to award prejudgment interest. The award of prejudgment interest is within the discretion of the trial court. Bergquist v. Anderson-Greenwood Aviation Corp., (In re Bellanca Aircraft Corp.), 850 F.2d 1275, 1281 (8th Cir. 1988). We find no statutory authority directing the court that it must award prejudgment interest in this situation. Id. Certainly a good faith dispute existed in this case. The bankruptcy court's ruling was not an abuse of discretion.

## III. CONCLUSION

Finding no error in the bankruptcy court's determination that the transaction was an avoidable preference under the Bankruptcy Code, we affirm.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.