# United States Bankruptcy Appellate Panel
# FOR THE EIGHTH CIRCUIT

_____

No. 03-6057WM

_____

| | | |
|---|---|---|
| In re: | * | |
| | * | |
| Payless Cashways, Inc., | * | |
| | * | |
| Debtor. | * | |
| | * | |
| | * | |
| Silverman Consulting, Inc., | * | |
| Chapter 11 Trustee for | * | |
| Payless Cashways, Inc., | * | |
| | * | Appeal from the United |
| Plaintiff - Appellant. | * | States Bankruptcy Court |
| | * | for the Western District of |
| v. | * | Missouri |
| | * | |
| Canfor Wood Products | * | |
| Marketing, d/b/a Canadian | * | |
| Forest Products LTD, d/b/a | * | |
| Canfor U.S.A. Corp., d/b/a Canfor | * | |
| Panel & Fibre Marketing Ltd., | * | |
| | * | |
| | * | |
| Defendant - Appellee. | * | |
| | * | |

_____

Submitted: January 21, 2004
Filed:   March 1, 2004

_____

Before SCHERMER, DREHER, and MAHONEY, Bankruptcy Judges.

DREHER, Bankruptcy Judge.

This appeal concerns the contemporaneous exchange for new value defense, 11 U.S.C. § 547(c)(1). The bankruptcy court[1] held that Silverman Consulting, Inc., ("the trustee") had established that four transfers were preferences, but that the defendant had established this defense and the transfers were not avoidable. We consider whether what appear on their face to be a credit transactions were in fact cash-on-delivery sales, or the substantial equivalent. In our view, our decision turns largely on a construction of the contracts between the parties.

## FACTS AND PROCEDURAL HISTORY

Debtor, Payless Cashways, Inc. ("Payless") was a large retailer of home improvement products. Appellee, Canfor Corporation, parent company of Canfor Wood Products Marketing and Canadian Forest Products Ltd. (collectively "Canfor"), is a large producer of lumber in Canada. This is Payless's second bankruptcy case. Payless first filed for bankruptcy protection on July 21, 1997. Canfor had been a large pre-petition supplier of lumber products to Payless. In that bankruptcy case, Canfor filed an unsecured claim for approximately $300,000 and received a distribution in the form of Payless stock. Between the first bankruptcy filing and June 4, 2001, when Payless filed this, its second, bankruptcy case Canfor continued to supply lumber to Payless under various credit terms. At first, Canfor agreed to supply Payless on a cash-in-advance basis with payment by Electronic Fund Transfer (EFT) and by check. Later, over time, Canfor slowly loosened this policy and revised its payment terms a number of times, each time slightly expanding its credit exposure. During these years Payless purchased several million dollars worth of lumber

---

[1] The Honorable Arthur B. Federman, Chief Judge, United States Bankruptcy Court for the Western District of Missouri.

annually from Canfor.  Canfor shipped lumber to Payless by rail and by truck.  All of the contracts were destination contracts, F.O.B. the buyer's facilities.  The payment terms Canfor offered to Payless were based, in part, on whether the shipment was by rail or truck.  Lumber sent by rail took on average 12-14 days following shipment and lumber sent by truck took on average 3-5 days following shipment to arrive at Payless facilities.  Canfor generally gave Payless terms which would correspond the due date for payment with the date the lumber arrived at Payless facilities.  However, at times Canfor was exposed to a credit risk because lumber would arrive before payment was made.

On January 24, 2001, executives of Canfor and Payless met.  At that meeting they discussed the conditions upon which Canfor would continue to do business with Payless.  Canfor was concerned about its credit exposure and attempted to negotiate conditions that would mitigate that risk.  The bankruptcy court found that at this meeting the parties agreed to payment terms designed to substantially reduce the risk of nonpayment when they agreed to changes designed to match up the actual delivery of lumber with Payless' obligation to wire transfer payments.  Payless also agreed to make all payments by EFT.  Based on assumptions as to the normal number of days shipments were in transit by rail or truck, Canfor agreed to ship on payment terms of one percent 11, net 12 days for lumber shipped by rail and one percent 2, net 3 days for lumber shipped by truck.[2]

A Canfor executive testified that the invoice date was and always had been the shipment date and that calculation of due dates printed on Canfor invoices started with the invoice date, added the number of days in the stated term, and then adjusted the due date so that payments otherwise due on Saturdays and Sundays were due on

---

[2]     Evidence produced during trial indicates that the 12-14 day normal transit time was an underestimate of actual delivery times, with some deliveries occuring as many as 34 days after invoice date.

the following Monday.  All invoices issued to Payless by Canfor based due dates upon the discount day and listed the net amount reduced by the applicable discount. All invoices which covered Canfor's shipments to Payless were F.O.B. Payless's receipt points.

During the period from February 13, 2001 through May 13, 2001, for invoices issued under the payment terms agreed to at the January 24, 2001, meeting, Payless paid Canfor for rail shipments, on average, 10.9 days after the date of the invoice. During that same period Payless paid Canfor for truck shipments, on average, 3.2 days after the date of the invoice.  For all these shipments, with minor exception, Payless paid by EFT for specific shipments before or at the time they arrived at Payless.

On Monday, May 14, 2001, Canfor received a payment from Payless by EFT totaling $198,287.58.  This transfer was in payment of 7 invoices: one for $10,135.00 for lumber shipped by truck on May 9, 2001, with payment due on May 11, 2001; $1,000 for lumber shipped on April 29, 2001 with payment due May 10, 2001; and the remaining 5 for lumber shipped by rail on April 30, 2001, with payment due on May 11, 2001.  The $1,000.00 invoice was not for lumber shipped, but for funds still due from a short payment made on Thursday, May 10, 2001, on that same invoice. As to this transfer, Payless paid for the lumber shipped by truck within 5 days of shipment and for the lumber shipped by rail within 14 days of shipment.

On Wednesday, May 16, 2001, Canfor received a payment from Payless by EFT totaling $314,528.48.  This transfer was in payment of 9 invoices: 8 for lumber shipped by rail (4 of which were shipped on May 1, 2001, with payments due May 14, 2001; 2 of which were shipped on May 2, 2001, with payments due on May 14, 2001; and 2 of which were shipped on May 3, 2001, with payments due May 14, 2001), along with an invoice for $10,872.96 for lumber shipped by truck on May 10, 2001, with payment due on May 11, 2001.  As to this transfer, Payless paid for the

4

lumber shipped by truck within 6 days of shipment and for lumber shipped by rail within 13 to 15 days of shipment.

On Thursday, May 17, 2001, Canfor received a payment from Payless by EFT totaling $205,628.11. This transfer was in payment of 6 invoices: 5 shipments by rail shipped on May 4, 2001, with payments due on May 15, 2001, and a shipment shipped by truck on May 5, 2001, with payment due on May 15, 2001. As to this transfer, Payless paid for the lumber shipped by truck within 6 days of shipment and the lumber shipped by rail within 13 days of shipment.

Finally, on Friday, May 18, 2001, Canfor received a payment from Payless by EFT totaling $102,120.19. This transfer was in payment of 3 invoices for lumber shipped by rail on May 7, 2001, with payments due on May 18, 2001. As to this transfer, Payless paid for the lumber shipped by rail within 11 days of shipment. Payless underpaid the charges on these invoices by $10,000.00.

Of the 25 shipments covered by these 4 transfers, 22 were by rail. Of these 22 shipments, Payless paid for 3 within 11 days, 7 within 13 days, 7 within 14 days, and 5 within 15 days of shipment. The remaining 3 shipments covered by these 4 transfers were by truck and totaled $33,748.63. Of these 3 shipments, Payless paid for 1 within 5 days and 2 within 6 days of shipment. As to these truck shipments, it is possible that Payless received some lumber prior to making payment by EFT. However, the testimony of both Payless and Canfor witnesses was that both sides considered truck shipments the same as cash transactions because of the short terms; thus the truck shipments are not a major issue in this case.

In spite of the fact that Canfor was trying to reduce its credit risk so that it would not deliver lumber for which it had not received payment, neither Canfor nor Payless kept regular records of when any shipments actually arrived at Payless facilities. At trial, however, 8 railroad shipping records, the only records of actual

5

delivery date available on the 22 rail deliveries, established that all 8 were paid for many days before delivery.

Payless filed its bankruptcy petition on June 4, 2001. On April 10, 2002, the bankruptcy trustee filed an adversary proceeding seeking to recover the four transfers made by EFT on May 14, 16, 17 and 18, 2001. The trustee asserted that each of the transfers was a preference under section 547(b) of the Bankruptcy Code. 11 U.S.C. § 547(b). Canfor, in addition to denying that the transfers were preferential, asserted three defenses: contemporaneous exchange for new value (11 U.S.C. § 547(c)(1)), ordinary course of business (11 U.S.C. § 547(c)(2)), and subsequent new value (11 U.S.C. § 547(c)(4)). Canfor agreed that the trustee could establish all elements of a preferential transfer except the antecedent debt requirement. As to this, the bankruptcy court found that an antecedent debt is created when goods are shipped.[3] The bankruptcy court went on to hold, however, that Canfor had met its burden of proof to establish that the four transfers were for new value in a contemporaneous exchange transaction and thus not avoidable under section 547(c)(1). 11 U.S.C. § 547(c)(1). Having determined that Canfor had prevailed on one of its three alleged defenses, the bankruptcy court declined to make any rulings on the ordinary course of business or subsequent new value defenses.

DECISION

A. STANDARD OF REVIEW

---

[3]The contemporaneous exchange for new value defense only becomes relevant if the all of the elements of section 547(b) can be proven and the "defense does not even come into play unless the payment is for *antecedent* debt." In re Jannel Indus., Inc., 245 B.R. 757, 760 (Bankr. D. Mass. 2000)(emphasis in original).

We review "the bankruptcy court's factual findings for clear error and its conclusions of law *de novo*." Drewes v. Vote (In re Vote), 276 F.3d 1024, 1026 (8th Cir. 2002). "'The critical inquiry in determining whether there has been a contemporaneous exchange for new value is whether the parties intended such an exchange.'" *See* Tyler v. Swiss Am. Sec., Inc. (In re Lewellyn & Co., Inc.), 929 F.2d 424, 428 (8th Cir.1991)(*quoting* Creditors Committee v. Spada (In re Spada), 903 F.2d 971, 975 (3d Cir.1990)). The existence of contemporaneous intent and new value are questions of fact, the determination of which we review for clear error. *See* Official Plan Comm. v. Expeditors Int'l of Washington, Inc. (In re Gateway Pac. Corp.), 153 F.3d 915, 918 (8th Cir. 1998). The bankruptcy court's interpretation of the contract between Payless and Canfor, if it did not go beyond the "four corners" of an unambiguous contract, we review *de novo*. *See* Stevenson v. Stevenson Assocs. (In re Stevenson Assocs., Inc.), 777 F.2d 415, 418 (8th Cir. 1985): General Electric Capital Corp. v. Dial Business Forms (In re Dial Business Forms, Inc.), 283 B.R. 537, 540 (B.A.P. 8th Cir. 2002) *aff'd* 341 F.3d 738 (8th Cir. 2003).

B.    CONTEMPORANEOUS EXCHANGE FOR NEW VALUE

Section 547(b) of the Bankruptcy Code authorizes a trustee to avoid a transfer made to or for the benefit of a creditor for or on account of an antecedent debt if the transfer occurred within 90 days of the date of the bankruptcy filing, on the date of the transfer the debtor was insolvent or became insolvent as a result thereof, and the creditor received more on account of such transfer than it would have received in a Chapter 7 liquidation. 11 U.S.C. § 547(b). Section 547(c)(1) of the Bankruptcy Code excepts certain transfers from the trustee's avoidance power including "to the extent such transfer was – (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and (B) in fact a substantially contemporaneous exchange[.]" 11 U.S.C. § 547(c)(1). The purpose of the contemporaneous exchange for new value defense is

to encourage creditors to continue to deal with financially-distressed debtors, as long as their transactions involve true exchanges of equally-valued consideration.  Jones Truck Lines, Inc. v. Central States Pension Fund (In re Jones Truck Lines, Inc.), 130 F.3d 323, 326 (8th Cir. 1997).  "Other creditors are not adversely affected by such an exchange because the debtor [ ]...has received new value."  Dorholt v. Lindquist (In re Dorholt, Inc.), 224 F.3d 871, 873 (8th Cir. 2000).

To prevail on this defense Canfor had to prove by a preponderance of evidence, that in each instance 1) both Payless and Canfor intended the delivery of the lumber to Payless and the payment of money to Canfor to be a contemporaneous exchange, 2) the exchange was in fact substantially contemporaneous, and 3) the exchange was for new value.  Gateway Pac. Corp., 153 F.3d at 918; Jones Truck Lines,  130 F.3d at 326-27.  "In simplest terms, a defendant makes its case under this provision by proving that the debtor received new value in exchange for the payment in question, and that both debtor and creditor intended such an exchange."  In re Nation-Wide Exchange Services, Inc., 291 B.R. 131, 149-50 (Bankr. D. Minn. 2003).  The bankruptcy court found that Canfor had established each of these three elements of the defense.  We agree and we therefore affirm.

C.    THE THREE ELEMENTS OF PROOF

1.    *Intent*

Since parties rarely testify as to their intent, courts look to the circumstances surrounding each situation.  Village of San Jose v. McWilliams, 284 F.3d 785, 790 (7th Cir. 2002) (stating that actual intent is difficult to prove, and may be shown by circumstantial evidence); Rouse v. Stanke (In re Stanke), 234 B.R. 449, 457 (Bankr. W.D. Mo. 1999) (holding that intent to defraud may be proven by circumstantial evidence); Diamond Bank v. Carter (In re Carter), 203 B.R. 697, 706 (Bankr. W.D.

8

Mo. 1996) (stating that intent is rarely subject to direct proof, but must rather be established by circumstantial evidence). The bankruptcy court found four circumstances demonstrated that the parties intended the transfers to be a contemporaneous exchange.

First, the meeting on January 24, 2001, changed the relationship between the parties. Payless needed to purchase lumber from Canfor. Canfor was concerned about delayed payments in 2000. Canfor's primary concern was certainty of payment. Payless's primary concern was lumber. The parties, therefore, negotiated an agreement whereby Payless would pay for all lumber by EFT and Canfor would allow Payless an additional day longer than it had been doing in 2000 in which to pay for the lumber. Although this payment method was burdensome to Payless, Payless nevertheless agreed to this condition.

Second, the bankruptcy court found that Canfor wanted to minimize its credit exposure. Canfor negotiated an agreement that would assure that Canfor received payment prior to or contemporaneously with delivery of the lumber and that Canfor and Payless both considered the terms for truck shipments, at least, to be the same as a cash transaction.

Third, the bankruptcy court found that all of the contracts were destination contracts, not shipment contracts, pursuant to which the parties intended that Payless would not obtain possession or any ownership right in the lumber until after it had been paid for. While Canfor had never diverted a shipment, the parties agreed that under the invoices as written, Canfor had the authority to do so if it did not receive timely payment. Canfor booked each shipment as a receivable on the date of shipment and Payless booked each shipment as a payable on that same date. Nonetheless, the bankruptcy court held, if Payless had failed to pay for the lumber, Canfor could have refused to deliver regardless of Payless's solvency. The court

9

found that Payless understood this, yet chose to continue to purchase lumber from Canfor under the terms Canfor insisted upon.

Fourth, as to 8 of the 22 transactions involving shipment by rail, for which there were actual records of delivery dates, Canfor received payment from 7 to 21 days before Payless received the lumber. The bankruptcy court found the trustee had failed to prove a single instance involving any of the 25 transactions in which Payless received lumber prior to the time it wired a transfer payment by EFT. Based on these facts, the bankruptcy court found that the parties intended that Canfor's delivery of lumber be substantially contemporaneous with payment by Payless.

The trustee argues that a section 547(c)(1) defense cannot apply if just one party intends the transaction to be contemporaneous. The trustee makes reference to the testimony of a Payless employee who testified that he did not consider the rail contracts to be cash on delivery transactions. In the context of the balance of the evidence, this denial by Payless is not sufficient to render the bankruptcy court's finding on intent clearly erroneous. There was ample credible evidence to the contrary. As an appellate court, we may not upset a finding of intent unless it is clearly erroneous and we must give deference to the bankruptcy court's credibility determinations. Banks v. Vandiver (In re Banks), 267 F.3d 875, 876 (8th Cir. 2001).

The trustee further argues that, in fact, the documentation shows that both parties recognized the transactions were credit sales because both parties counted the credit days from the date that product was shipped and neither party actually tracked when lumber was physically delivered to Payless. From this, the trustee concludes that the parties treated the transaction as if value had been given when it was shipped and payment would come later. In this case there is no dispute that the payments were allocated to identifiable shipments. And, both Payless and Canfor agreed after the meeting on January 24, 2001, that Canfor would not continue to ship to Payless unless Payless paid by EFT. At issue are 25 shipments for which 4 payments were

10

made. All of the payments were made within 15 days of the shipment date for rail shipments and within 6 days of the shipment date for truck shipments. At least as to 8 of the shipments by rail, Canfor received payment prior to delivery and the court found that as to the other rail shipments there was no evidence presented by the trustee to suggest that those shipments were not also paid prior to delivery. The bankruptcy court found no dispute that Canfor shipped product to Payless in direct relationship to the payments it received and found that Canfor satisfied the intent requirement. This finding is amply supported by the record and is not clearly erroneous.

## 2. *Actually Contemporaneous*

Section 547(c)(1) also requires that transfers intended by the parties to be contemporaneous were, in fact, contemporaneous. 11 U.S.C. § 547(c)(1). Official Unsecured Creditors' Committee v. Airport Aviation Serv., Inc. (In re Arrow Air, Inc.), 940 F.2d 1463, 1465 (11th Cir. 1991). "The sparse legislative history of section 547(c)(1) shows that it was meant to protect exchanges of property that might be considered credit transactions when the transactions were contemporaneous transfers." In re Riley, 297 B.R. 122, 125 (Bankr. E.D. Ark. 2003)(citations omitted); *see also James J. White and Robert S. Summers*, 4 WHITE & SUMMERS, UNIFORM COMMERCIAL CODE, § 32-5 (5th ed.)(This exception protects transactions that were meant to be cash transactions, but which unavoidably involved a brief extension of credit.). In this instance, payment by EFT decreased the credit risk and minimized Canfor's credit exposure. Citing Kendall v. Liquid Sugars, Inc. (In re Honey Hill), 227 B.R. 530 (N.D. Cal. 1998) the bankruptcy court found:

> two striking similarities between this case and Honey Hill. First, the parties agreed on January 24, 2001, to new payment terms, and Payless made all payments by EFT. This is, in essence, a cash transaction, as the funds are received immediately upon transmittal. Second, there is

> undisputed testimony that Canfor received payment for most, if not all,
> of the shipments by rail before Payless received the [lumber].

Silverman Consulting Inc. v. Merillat Indus., et.al., Adv. No. 02-4065, slip op. at 15 (Bankr. W.D. Mo. Aug. 13, 2003).

The bankruptcy court also found facts of this case similar to the facts found in Grogan v. Southwest Textiles, Inc. (In re Advance Glove Mfg., Co.), 42 B.R. 489 (Bankr. E.D. Mich. 1984). In Advance Glove the debtor had done business with Southwest Textiles, Inc. (Southwest) for five years, but Southwest became concerned about the outstanding balance. In order to continue doing business, Southwest agreed to sell to the debtor only if the debtor could assure Southwest of payment for current shipments, and continue to pay some amount on the outstanding balance. Debtor called each week and Southwest shipped an amount of yarn based on the amount of money debtor had on hand. Thus, the shipment of the yarn and the payment crossed en route. The bankruptcy court held that the parties intended these transactions to be a contemporaneous exchange even though the books and records of Southwest did not identify a particular payment with a particular invoice. The dates of payment and shipment established that the transfers were intended to be contemporaneous exchanges for new value and that the transfers were in fact substantially contemporaneous exchanges for new value. The fact that Southwest did not allocate a payment to an identifiable shipment was not fatal to its section 547(c)(1) defense. *Id*. at 493-94.

A transaction can be substantially contemporaneous even if some temporal separation exists between the new value provided and the payment received. "[S]ection 547(c)(1) applies whether the new value is given before or after the transfer by the debtor; the statute requires only that the exchange be 'substantially' contemporaneous." Lewellyn & Co., 929 F.2d at 428-29. In Lewellyn, the debtor used his personal account to make large margin purchases of shares of stock. The debtor's broker required the debtor to make purchases on a cash basis. After the

debtor withdrew from his cash account 425,000 shares of stock for which he had fully paid, the broker informed the debtor that he and his customers could no longer buy on margin. Debtor then informed his broker that he was unable to settle approximately $8 million in cash stock purchases he had made in the preceding 7 business days. He offered the broker the 425,000 shares of stock he had earlier withdrawn from his cash account as collateral for his cash obligation. The dealer accepted the shares and placed them in the debtor's margin account. The broker also transferred all shares remaining in the debtor's cash account to his margin account. It later became evident that the debtor had purchased shares with embezzled funds and a bankruptcy case followed. *Id.* at 426-27. The Eighth Circuit recognized that with securities transactions a 7-day settlement period constituted a contemporaneous exchange for value. *Id*. (*citing* Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, 469 F.2d 1166, 1179-80 (8th Cir.1972)). In addition, the court looked to the agreement of the parties to determine whether an exchange is substantially contemporaneous in fact. *Id*. (citations omitted). In Lewellyn & Co., the clearing agreement between the broker and the debtor incorporated a recognized 7 day settlement period for cash transactions, and affirmed the bankruptcy court's finding that the exchange was substantially contemporaneous in fact.

Here, there was evidence that in some instances Payless paid before it received goods and there was no evidence that any of the goods shipped by rail arrived prior to Payless having paid for them. In any event, Payless paid by EFT in all instances within 15 days of shipment which, within the context of the agreement between the parties, was a substantially contemporaneous exchange in fact.

> By enacting Section 547 and empowering a trustee to avoid certain prepetition transfers of a debtor's property, Congress intended to: (1) discourage aggressive collection actions, by encouraging creditors to work with a financially troubled debtor so that a bankruptcy proceeding might be avoided; (2) prevent the diminishment of the assets of a financially troubled debtor to the detriment of similarly situated

creditors; and (3) once a financially troubled debtor filed a bankruptcy proceeding, promote a fundamental principle of the Bankruptcy Code, equality of distribution among similarly situated creditors.

Breeden v. L.I. Bridge Fund (In re Bennett Funding Group, Inc.), 220 B.R. 739, 741 (B.A.P. 2nd Cir. 1998)(*citing* H.R. REP. (1977), reprinted in 1978 CODE CONG. & ADMIN. NEWS 5787, 6138).  The bankruptcy court's holding that the exchange was actually contemporaneous upholds Congressional intent.  Canfor traded lumber for money.  The transfer by Canfor of lumber enhanced the value of Payless and payment to Canfor did not diminish the value of the estate since the exchange of lumber and the payment were in fact contemporaneous.   The bankruptcy court correctly determined that allowing recovery of the funds transferred to Canfor would unduly enhance other creditors at the expense of Canfor, even though Canfor did nothing to put itself in a preferential position as it relates to other creditors.

    3. *New Value*

The third and final element of this defense is that new value was given.  New value is a defined term:

> For purposes of 11 U.S.C. § 547, "new value" is defined as money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation.

Stewart v. Barry County Livestock Auction, Inc. (In re Stewart), 282 B.R. 871, 873 (B.A.P. 8th Cir. 2002); 11 U.S.C. § 547(a)(2).

As indicated earlier, the key question in this case is when new value was given.  The foregoing discussion of the first two elements of proof assumes that the

contracts between the parties were not credit transactions, even though based on the invoices they may have looked like such. The key issue we need to address therefore is when did the contracts contemplate value would be given. Was it, as the trustee argues, when the goods were shipped, in which case the trustee would be correct that these were standard credit-type transactions. Or was it, as Canfor argues, when the goods were delivered, in which case these were essentially cash on delivery transactions. The bankruptcy court determined that, while Canfor shipped and invoiced before payment was received, the contracts contemplated that nothing would be exchanged and no value would be given until the lumber was delivered to Payless. The bankruptcy court found no ambiguity in this arrangement. Since the bankruptcy court found no ambiguities in the contracts, we review that determination and its interpretation of the contract *de novo*. Dial Business Forms, Inc., 283 B.R. at 540. If the contracts had been ambiguous, the interpretation implicates questions of fact which we review for clear error. *Id*. (citations omitted). After review, we agree that the contracts between Payless and Canfor were unambiguous and we find no error in the bankruptcy court's interpretation of them. *See* Dial Business Forms, 283 B.R. at 540. The contracts contemplated delivery to be contemporaneous with payment and that value would not be given until Payless paid and Canfor delivered at destination.

Ordinarily, of course, if a seller ships product to a buyer and invoices for payment at a later time, the parties contemplate a credit transaction. However, in this case, it is undisputed that Canfor shipped lumber to Payless by destination contract. All invoices provided that the goods were being shipped F.O.B. Payless's facilities. A destination contract is one in which the seller bears the expense and risk of shipment:

> (1) Unless otherwise agreed the term **"F.O.B."** (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which . . .
>
> > (b) when the term is F.O.B. the place of destination, the seller

must at his own expense and risk transport the goods to that place and there tender delivery of them in the manner provided in this article.

MO. STAT. ANN. § 400.2-319(b)(1994).

As a destination contract Canfor retained title to, and control over, the goods until the goods were delivered.  MO. STAT. ANN. § 400.2-401(2)(b); *see also* Black's Law Dictionary 642 (6th ed. 1990)("Free on board some location (for example, FOB shipping point; FOB destination).  A delivery term which requires a seller to ship goods and bear the expense and risk of loss to the F.O.B. point designated....  Title to goods usually passes from seller to buyer at the FOB location.")

Although the testimony during trial established that Canfor retained the authority to divert shipments from Payless at all times prior to delivery, the trustee argued that this is irrelevant because under sections 400.2-702,-703, and -705, of the Missouri UCC,  a seller has the legal ability to stop delivery of goods if the buyer becomes insolvent or fails to make the payment due.[4] The trustee correctly states that these remedies apply *regardless* of whether the agreement is a shipment or a destination contract. *See, e.g.* Pester Refining Co. v. Mapco Gas Products, Inc. (In re Pester Refining Co.), 845 F.2d 1476, 1482 (8th Cir. 1988)(it is irrelevant whether the buyer or seller has title to the goods when evaluating the seller's right to stop a shipment in transit); In re Trico Steel, Co., LLC, 282 B.R. 318, § 323-24 (Bankr. D. Del. 2002);  In re Nevins Ammunition, Inc., 79 B.R. 11, 16 (Bankr. D. Id. 1987) ("[W]hether a contract is a 'shipment' contract or a 'destination' contract is of little

---

[4]     Mo. Stat. Ann. § 400.2-702.  Seller's remedies on discovery of buyer's insolvency (1) Where the seller discovers the buyer to be insolvent he may refuse delivery except for cash including payment for all goods theretofore delivered under the contract, and stop delivery under this article (section 400.2-705).

or no consequence or relevance to a stoppage in transit discussion."). This argument, however, misses the point.

In an F.O.B. contract Canfor's contractual obligation to Payless continued after shipment until actual delivery to Payless. Stopping delivery for non-payment or for any other reason was not a collection remedy; nonpayment was a contractual breach that would relieve Canfor of its obligation to deliver. *See* MO. STAT. ANN. § 400.2-703. "The obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." MO. STAT. ANN. § 400.2-301. Unlike a "shipment" contract where Canfor's obligation to Payless ended at delivery to the carrier, a "destination" contract required Canfor to bear the risk of loss, incur the obligation of delivery, and transfer title at a point designated by Payless. *See* MO. STAT. ANN. §§ 400.2-601 and -319.

The trustee relies upon the case <u>Rushton v. E&S Int'l Enterprises, Inc. (In re Eleva, Inc.)</u>, 235 B.R. 486 (B.A.P. 10th Cir. 1999), for the proposition that shipment creates only an extension of credit. In <u>Rushton</u>, two separate product shipments were sent on December 20 and the debtor delivered the check in payment for the two shipments on January 3. The bank honored the check on January 6. The first shipment arrived on January 6, and the second arrived on January 9. The court noted that the creditor "extended credit and shipped the goods before the preference [payment] occurred." <u>Id</u>. at 489. However, Rushton did not involve a destination contract. Rushton's obligation under the contract was performed upon shipment, unlike Canfor's obligation that required delivery to destination.

"Though it is often true that shipment or identification of the goods gives rise to a claim for payment, it is because the ordinary case does not involve a delivery contract." <u>In re Production Steel Inc.</u>, 54 B.R. 417, 421 (M.D. Tenn. 1985)(citation omitted). An F.O.B. place of destination term "is a delivery term" which requires the seller to transport goods at his expense and risk and to tender delivery by putting and

holding them at the buyer's disposition, giving the buyer any notification reasonably necessary to enable him to take delivery. *Id.*; MO. STAT. ANN. §§ 400.2-319(1)(b).

> [U]nder this Article the "shipment" contract is regarded as the normal one and the "destination" contract as the variant type. The seller is not obligated to deliver at a named destination and bear the concurrent risk of loss until arrival, unless he has specifically agreed so to deliver or the commercial understanding of the terms used by the parties contemplates such delivery.

UNIFORM COMMERCIAL CODE § 2-503 cmt. 5 (1994).[5]

In a destination contract "a buyer's duty to pay for goods is conditional on tender of delivery by the seller." MO. STAT. ANN. § 400.2-507(1). Tender of delivery entitles the seller to payment. *Id.* Although an antecedent debt may have been created at the time of shipment, applying ordinary principles under the UCC, Payless did not become obligated to pay the contract price until Canfor tendered delivery. *Id.*

The bankruptcy court found that, because the invoices created a destination, rather than the more normal shipment, contact, the parties intended that a right to payment arose upon delivery not upon shipment and therefore it was delivery, rather than shipment, that was the new value. Although the contract terms provided for a different price depending upon time of shipment, this was not a credit term, but a price term since Payless had no obligation to pay until delivery. In the context of a destination contract this reading makes more sense than deeming "new value" being given upon shipment. It follows that in this type of contract, new value was given upon delivery by Canfor, contemporaneous with payment by Payless.

---

[5]"Although the UCC Comments do not have the same force as statutes enacted by the legislature, they provide persuasive assistance in interpreting UCC provisions." Carlund Corp. v. Crown Center Redevelopment, 849 S.W.2d 647, 650 (Mo. App. 1993).

The trustee argues that the only difference between a shipment and a destination contract is who bears the risk of loss in transit and that Payless obtained a property interest as soon as the product was shipped. The argument seems to follow from section 400.2-501 of the Missouri UCC, which provides in part that:

 (1) The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are nonconforming and he has an option to return or reject them.

MO. STAT. ANN. § 400.2-501(1).

This "insurable interest", however, is separate and distinct from the duty to pay which arises upon delivery and acceptance (unless the contract provides otherwise). *Id*. (Insurable interest in goods); MO. STAT. ANN. § 400.2-507(Effect of seller's tender).

The trustee further argues that it is inconsistent to hold that an antecedent debt was created when the lumber was shipped and to hold that new value was not given until the product was received. To the contrary, "antecedent debt" and "new value" are distinct concepts. Jannel Indus., 245 B.R. at 760. The bankruptcy court held that an antecedent debt arose upon shipment. "A debt is 'antecedent' if it was incurred before the allegedly preferential transfer." Jones Truck Lines, Inc. v. Cent. States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.), 130 F.3d 323, 329 (8th Cir. 1997). "A debt is incurred 'on the date upon which the debtor first becomes legally bound to pay.'" *Id*. (*quoting* In re Iowa Premium Serv., Co., 695 F.2d 1109, 1111 (8th Cir. 1982) (en banc)); In re Armstrong, 291 F.3d 517 (8th Cir. 2002). At the time of shipment and invoicing the parties were mutually bound to a contract which required Canfor to ship lumber and required Payless to pay in accordance with the contract terms. The consideration for the contract was the mutual promises each party made to the other. At that time, if either had refused to perform, the nonperforming party would have been in breach. This is wholly distinct

19

from the question of when tangible new value is given. The bankruptcy court correctly held that in a destination contract the creation of the debt and the delivery of new value occur at different times.

CONCLUSION

In conclusion, the bankruptcy court's reasoning follows sound policy. Canfor knew it had a problem customer in Payless and Payless needed lumber to continue to do business. The agreement Payless and Canfor reached resulted in Payless paying Canfor prior to or substantially contemporaneous with Canfor delivering the lumber. The parties performed as agreed and the estate was not diminished as a result of the transfers. Accordingly, we affirm.

A true copy.

Attest:

CLERK, U.S. BANKRUPTCY APPELLATE PANEL
FOR THE EIGHTH CIRCUIT