In re Robert K. SIBILRUD, Judy J. Sibilrud, Debtors.

Randall L. Seaver, Trustee, Plaintiff,

v.

Allstate Sales & Leasing Corp., Defendant.

Bankruptcy No. 02–32667.
Adversary No. 03–3227.

United States Bankruptcy Court, D. Minnesota.

April 19, 2004.

William L. Bodensteiner, Austin, MN, Stephen R. Erickson, Albert Lea, MN, for Debtors.

Thomas Egan, Apple Valley, MN, for Allstate.

Andrea Hauser, Burnsville, MN, for trustee.

## ORDER FOR JUDGMENT

DENNIS D. O'BRIEN, Bankruptcy Judge.

This matter came before the Court for trial on the plaintiff Chapter 7 Trustee's complaint under 11 U.S.C. § 547(b) seeking to avoid the debtor's transfers of $2,000 to the defendant Allstate Sales & Leasing Corporation (Allstate). Andrea Hauser appeared on behalf of the Trustee, and Thomas Egan appeared on behalf of Allstate. At the conclusion of the trial, the Court took the matter under advisement.

Based on all the files, records and proceedings herein, the Court, now being fully advised in the premises, makes the following Order pursuant to the Federal and Local Rules of Bankruptcy Procedure. For the reasons fully set forth below, the Court rules in favor of the Trustee and orders judgment against Allstate.

## I. FACTUAL BACKGROUND

Allstate is a franchise dealer for Peterbilt heavy duty and GMC (class 6) trucks, and provides parts and repairs for its buyers, mostly owner-operators and small fleet owners (owners of 1–5 trucks). The debtor Robert K. Sibilrud (Sibilrud), at and prior to the time of filing, managed the family farm and was also employed as an owner-operator truck driver. On or about July 25, 2000, Sibilrud was approved by Allstate for an open account which granted Sibilrud a line of unsecured credit for the maintenance and service by Allstate of the trucks he was using in his small trucking operation. The ordinary payment terms required payment for parts and services to be made on or before the tenth day of the month following the invoice date.

Until approximately June, 2001, Sibilrud was on-time in making payments for Allstate services on his trucks. Thereafter, he began to fall behind. By November, 2001, Sibilrud had an account balance of $23,860.19. For one truck, Allstate provided repairs and billed Sibilrud on September 25, 2001, in the amount of $2,098.04, and on October 31, 2001, in the amount of $11,347.30. At some point shortly thereafter, Allstate provided ongoing services on Sibilrud's trucks on a cash-on-delivery (COD) payment basis only.

In order to secure payment on Sibilrud's mounting balance, Allstate withheld his 1997 Peterbilt truck from Sibilrud based on the $2,098 and $11,347 invoices for services on that truck. On December 20, 2001, Allstate filed a lawsuit against Sibilrud in state court in Dakota County, Minnesota, to recover the debt. On January 8, 2002, Allstate gave notice of a mechanic's lien foreclosure sale against Sibilrud's truck to recover its lien of $15,695.34. On January 15, 2002, Allstate served Sibilrud with a 10–day garnishment notice. On

January 25, 2002, Allstate obtained a judgment against Sibilrud for $24,458.29, and obtained a writ of execution. On January 30, 2002, Allstate served its notice of levy to collect the judgment.

Security State Bank of Mankato, however, also had an interest in Sibilrud's truck. To preserve its interest, the Bank issued a payment to Allstate and Sibilrud in the amount of $13,500 on January 31, 2002, in satisfaction and release of Allstate's mechanic's lien against the truck. The attendant reduction in the amount due on the Judgment, and the release of the truck back to Sibilrud, prompted Allstate to cancel the lien foreclosure sale. Allstate applied the $13,500 to Sibilrud's outstanding balance, specifically to invoices from June, September and October, 2001.

On February 1, 2002, Allstate proceeded to record its judgment against Sibilrud in the county of his residence, Freeborn County. On the same day, at the suggestion of Richard Brown of W.D. Larson Companies,[1] Sibilrud executed a promissory note in the amount of $11,150 payable to Allstate in $1,000 monthly payments to start on February 20, 2002. On February 26, 2002, Sibilrud made a $1,000 payment to Allstate pursuant to the note. Allstate applied it against the note and equally against three outstanding invoices from June, 2001.[2] In March and April, 2002, Sibilrud obtained services from Allstate and paid for those services COD. However, he made no payments on the note.

On April 30, 2002, Allstate resumed aggressive collection efforts by filing for an order for disclosure from the Dakota County District Court. On May 8, 2002, Allstate served a notice of levy on Sibilrud's employer, Waymore Transportation, and obtained the order for disclosure on May 14, 2002. In order to prevent garnishment of his wages, Sibilrud made three payments on the note, each in the amount of $1,000, on May 31, 2002, June 21, 2002, and July 12, 2002. All three payments were applied by Allstate against the note and equally against various outstanding invoices from June, 2001. On July 26, 2002, Sibilrud and his wife filed a voluntary bankruptcy petition under Chapter 7.

## II. DISCUSSION

On July 31, 2003, the Trustee brought this adversary proceeding under 11 U.S.C. § 547(b) to recover the $1,000 payments made by Sibilrud to Allstate on June 21 and July 12, 2002. Section 547(b) provides:

Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

 (1) to or for the benefit of a creditor;

 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

 (3) made while the debtor was insolvent;

 (4) made—

---

1. W.D. Larson Companies is a holding company for approximately thirteen Peterbilt truck dealers, including Allstate. Richard Brown founded and led the predecessor to W.D. Larson Cos., All Wheels Financial, for almost twenty years, and still has an active governing role in the holding company, the financing of the dealer-buyer transactions, and buyer open accounts with dealers.

2. Brown explained that once a balance has been relegated to an executed promissory note, the usual monthly statements on open accounts are no longer issued. The old balance is converted into a new debt for accounting purposes. However, the note payments are also applied to match up against specific outstanding invoices.

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

*See* 11 U.S.C. § 547(b).

There is no dispute that Sibilrud's June and July 2002 payments to Allstate constitute preferential transfers under § 547(b). Allstate concedes that the record demonstrates each § 547(b) element with respect to those payments, but in defense raises the § 547(c)(2) exception. The payments, Allstate claims, were made in the ordinary course:

(c) The trustee may not avoid under this section a transfer—

(2) to the extent that such transfer was—

(A) in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee;

(B) made in the ordinary course of business or financial affairs of the debtor and the transferee; and

(C) made according to ordinary business terms.

*See* 11 U.S.C. § 547(c)(2).

■ The burden is on the creditor claiming the § 547(c)(2) exception to show all three statutory elements by a preponderance of the evidence. *See Harrah's Tunica Corp. v. Meeks (In re Armstrong),* 291 F.3d 517, 526–527 (8th Cir.2002), citing *Official Plan Comm. v. Expeditors Int'l of Washington, Inc. (In re Gateway Pac. Corp.),* 153 F.3d 915, 917 (8th Cir.1998). Failure under any one of the three elements dooms the entire exception. *See Central Hardware Co., Inc. v. Sherwin–Williams Co. (In re Spirit Holding Co., Inc.),* 153 F.3d 902, 904 (8th Cir.1998).

[3] "[T]he policies underlying the ordinary business exception are two-fold: (1) to encourage creditors to continue dealing with troubled debtors, and (2) to promote equality of distribution." *Armstrong,* 291 F.3d at 527, citing *Union Bank v. Wolas (In re ZZZZ Best Co.),* 502 U.S. 151, 161, 112 S.Ct. 527, 116 L.Ed.2d 514 (1991). The legislative history of § 547(c)(2) indicates that the purpose of this section is "to leave undisturbed normal financial relations, because it does not detract from the general policy of the preference section to discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy." *Spirit Holding,* 153 F.3d at 904, citing S.Rep. No. 95–989 at 88 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5874; H.R.Rep. No. 95–595 at 373 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6329.

■ The Court "must construe this exception narrowly, because it places one creditor on better footing than all the other creditors." *Armstrong,* 291 F.3d at 527, citing *Jobin v. McKay (In re M & L Bus. Mach. Co.),* 84 F.3d 1330, 1339 (10th Cir. 1996).

*Debt Incurred in the Ordinary Course of Business*

■ "The Bankruptcy Code defines 'debt' as a 'liability on a claim.'" *Armstrong,* 291 F.3d at 522, citing *Laws v.*

*United Mo. Bank of Kansas City, N.A.,* 98 F.3d 1047, 1049 (8th Cir.1996) (citing 11 U.S.C. § 101(12)). "A debt is 'antecedent' if it was incurred before the allegedly preferential transfer." *Armstrong,* 291 F.3d at 522, citing *Jones Truck Lines, Inc. v. Cent. States, Southeast and Southwest Areas Pension Fund (In re Jones Truck Lines, Inc.),* 130 F.3d 323, 329 (8th Cir. 1997). "A debt is incurred 'on the date upon which the debtor first becomes legally bound to pay.'" *Id.* (quoting *In re Iowa Premium Serv., Co.,* 695 F.2d 1109, 1111 (8th Cir.1982) (en banc)).

■ The Trustee contends that the two payments in question were not to pay a debt incurred in the ordinary course of business between Sibilrud and Allstate, and that Allstate's defense fails under § 547(c)(2)(A). The Trustee claims that the payments were made on a promissory note executed in settlement of legal proceedings against Sibilrud, and as such not related to the formerly ordinary business relationship of truck driver and repairs provider between Sibilrud and Allstate.

Indeed, in addressing the fact that the automatic monthly statements on open accounts are no longer generated for customers who have executed promissory notes, Brown explained that the old balance is wrapped into new debt: that at least for accounting purposes the note represents "new debt." The testimony of Allstate's witness, therefore, comports with the Trustee's theory. Nevertheless, the Court finds the premise tenuous.

First, while for bookkeeping Allstate separated the note from the actual underlying service invoices, it also applied payments against the note to those actual underlying invoices in sums equal to the note payments made. The note did not clear Sibilrud's balance on his open account with Allstate. If Sibilrud had not ultimately slid into bankruptcy, and if he had made all the payments on the note, his Allstate account might have eventually come current—the debts incurred on the original invoices were not written off and the open account was not closed as a result of the note. Moreover, Sibilrud continued to obtain services from Allstate on a COD basis as late as April, 2002, indicating that the basic transactional relationship between the parties did not terminate by execution of the note.

Second, the Court is not inclined to rule that every debt restructuring situation renders the debt new and distinct from the underlying debt that was in fact incurred in the ordinary course. *See Arrow Electronics, Inc. v. Justus (In re Kaypro),* 218 F.3d 1070, 1073–1074 (9th Cir.2000) (bankruptcy court erred in holding that payments made pursuant to a restructuring agreement are per se outside the ordinary course of business category ... [t]he better rule ... is that such determination is a question of fact). "The Second Circuit has explained why in *In re Roblin Industries, Inc.,* 78 F.3d 30 (2d Cir.1996): It is not difficult to imagine circumstances where frequent debt rescheduling is ordinary and usual practice within an industry, and creditors operating in such an environment should have the same opportunity to assert the ordinary course of business exception." *Id.,* citing *In re U.S.A. Inns of Eureka Springs, Ark., Inc.,* 9 F.3d 680, 685 (8th Cir.1993) (regular practice in savings and loan industry to adopt payment plans for delinquent customers); *Armstrong v. John Deere Co. (In re Gilbertson),* 90 B.R. 1006, 1012 (Bankr.D.N.D.1988) (deferral agreements common in retail farm implement sales industry).

In this instance, the payments in question were applied not only against the note, but also reduced the outstanding debt that was undoubtedly incurred in the ordinary course of business between Sibil-

rud and Allstate. In any event, this element of the exception need not be dispositive because Allstate failed to meet its burden under § 547(c)(2)(B).

*Payment in the Ordinary Course of Business*

 "[T]here is no precise legal test which can be applied in determining whether payments by the debtor during the 90–day period were made in the ordinary course of business; rather, the court must engage in a peculiarly factual analysis." *Spirit Holding,* 153 F.3d at 904 (citations omitted). "The cornerstone of this element of a preference defense is that the creditor needs to demonstrate some consistency with other business transactions between the debtor and the creditor." *Id.,* citing *Lovett v. St. Johnsbury Trucking,* 931 F.2d 494, 497 (8th Cir.1991). "Section 547(c)(2)(B) is the subjective component of the statute, requiring proof that the debt and its payment are ordinary in relation to other business dealings between the creditor and the debtor." *See Official Plan Comm. v. Expeditors Int'l of Washington, Inc. (In re Gateway Pac. Corp.),* 214 B.R. 870, 874 (8th Cir. BAP 1997).

 In 2002, the Bankruptcy Appellate Panel for the Eighth Circuit explained that "a number of decisions articulate a four part test" for determining the § 547(c)(2)(B) element of the ordinary course exception. *See Concast Canada, Inc. v. Laclede Steel Co. (In re Laclede Steel Co.),* 271 B.R. 127, 131 (8th Cir. BAP 2002), *aff'd,* 47 Fed.Appx. 784 (8th Cir. 2002) (unpublished). "The factors the courts consider have been articulated as: (1) the length of time the parties were engaged in the transaction at issue; (2)

whether the amount or form of tender differed from past practices; (3) whether the debtor or the creditor engaged in any unusual collection or payment activity; and (4) whether the creditor took advantage of the debtor's deteriorating financial condition." *Laclede Steel,* 271 B.R. at 132, n. 3 (citations omitted).

The Court explained that "there is a general focus upon one of the factors and, if *any one* of the factors is compellingly inconsistent with prior transactions, the payment is deemed to be outside the ordinary course of business between the parties." *Laclede Steel,* 271 B.R. at 131–132 (emphasis original). In the same decision, the Court reiterated that "any significant alteration in any one of the factors may be sufficient to conclude that a payment was made outside the ordinary course of business." *Id.* at 132. While one of the factors is typically central to the analysis, "[t]he other, separate factors regarding other conduct between the parties—whether the terms were changed, whether the creditor exerted any pressure for collection—have more weight in the analysis" if the primary issue is a close call. *Id.*[3]

 This case is not a close call, uniquely because analysis of three of the four factors weigh against the creditor in this case. First, Sibilrud began his relationship with Allstate on July 25, 2000. For approximately a year, he paid on time and usually by check. Second, in August, 2001, he made a payment by wire transfer, which was not ordinary for the parties. Eventually, he was only permitted to continue to do business with Allstate on a COD basis. Third, by autumn of 2001, Allstate began what can only be defined,

---

3. "Thus, a court may conclude that a transfer, even though a few days later than was the practice during the pre-preference period, may be ordinary if there is no change in the collection methods." *Laclede Steel,* 271 B.R. at 132 (citations omitted). "In contrast, if there is any deviation in the collection method, the courts may be harsher in determining that a late payment was not in the ordinary course." *Id.* (citations omitted).

as between Sibilrud and Allstate, as unusual collection activity, including Brown making phone calls to Sibilrud regarding the delinquency, and withholding one Sibilrud's trucks to secure payment on September and October service invoices.

■■■ "[P]roof of an unusual collection effort has a tendency to show that a transfer occurred outside the ordinary course of business." *Spirit Holding*, 153 F.3d at 905. Courts have determined what constitutes unusual collection efforts for purposes of § 547(c)(2)(B) all along the collection spectrum: repeated phone calls to the debtor by an officer of the creditor, *see Schwinn Plan Committee v. AFS Cycle & Co., Ltd. (In re Schwinn Bicycle Co.)*, 205 B.R. 557, 572–573 (Bankr.N.D.Ill.1997); creditor's refusal to deliver new merchandise unless debtor makes payment on outstanding invoices, *see Braniff, Inc. v. Sundstrand Data Control, Inc. (In re Braniff, Inc.)*, 154 B.R. 773, 781–782 (Bankr.M.D.Fla.1993); creditor's new requirements of letter of credit and substantial downpayment and prepayment, *see Production Steel, Inc. v. Sumitomo Corp. of America (In re Production Steel, Inc.)*, 54 B.R. 417, 423 (Bankr.M.D.Tenn.1985); executing a settlement or restructuring agreement with the debtor to resolve legal action taken to collect the debt, *see Tolz v. Signal Capital Corp. (In re Mastercraft Graphics, Inc.)*, 157 B.R. 914, 919–921 (Bankr.S.D.Fla.1993), citing *Gull Air, Inc. v. Beech Acceptance Corp. (In re Gull Air, Inc.)*, 82 B.R. 1 (Bankr.D.Mass.1988) (payments made in response to civil action); *Xtra Inc. v. Seawinds Ltd. (In re Seawinds Ltd.)*, 91 B.R. 88, *aff'd*, 888 F.2d 640 (9th Cir.1989) (payments made in response to lease termination notice and increased lease payment).

In *Spirit Holding*, the Court of Appeals for the Eighth Circuit concluded that under the circumstances of that case, the debtor's wire-transfer payment, as opposed to its normal practice of paying invoices by check, "was a sufficient deviation from past dealings that the payment cannot qualify for the ordinary-course-of-business exception to the general rule of preference avoidance." *Spirit Holding*, 153 F.3d at 906.

Under the well developed case law on § 547(c)(2)(B), the wired payment, the phone inquiries from Brown himself, and the withholding of the truck could be enough to properly find many of the later payments Sibilrud made on outstanding invoices beyond the scope of the ordinary business relations between Sibilrud and Allstate. As it happens, there is much more in this case that renders that finding unequivocal. Allstate did not stop at phone calls. It filed a lawsuit against Sibilrud in state court, noticed a mechanic's lien foreclosure sale against Sibilrud's truck, served Sibilrud with a garnishment notice, obtained a judgment against Sibilrud, obtained a writ of execution, and finally served its notice of levy to collect the judgment, all in little more than one month's time.

Even though Sibilrud obtained funds from his Bank sufficient to cancel the lien foreclosure sale, secure the return of his truck from Allstate, and reduce the amount of Allstate's judgment against him, Allstate continued to vigorously pursue collection. It recorded its judgment against Sibilrud and, on the same day and at Brown's suggestion, the promissory note was executed. Sibilrud signed the promissory note in order to avoid garnishment of his wages. But, Sibilrud did not make the regularly scheduled payments on the note in March or April, 2002. Accordingly, Allstate resumed its efforts to garnish Sibilrud's wages. When garnishment was in fact imminent, Sibilrud starting making the $1,000 monthly payments.

The two payments at issue in this proceeding, made June 21 and July 12, 2002, were made by Sibilrud specifically to stay the garnishment of his wages.

While there may be some instances where payments made arising from restructured debt, and even out of settlement agreements or promissory notes, are payments made in the ordinary course of business or financial affairs of the debtor and the transferee, that is not the case here.[4] In this proceeding, the undisputed facts clearly illustrate aggressive collection litigation and legally adversarial postures between Sibilrud and Allstate but for ongoing COD transactions. The ordinary course of business for these parties was payment by the tenth day of the month following the issuance of the invoice, or, in other words, more or less within thirty days of services rendered. The ordinary course of business was not holding the serviced vehicle and initiating legal process to obtain payment, and not negotiating workout agreements to stay application of remedies at law. The payments on the note were not made in the ordinary course of business.

*Ordinary Business Terms*

Even if one could countenance the facts presented here as satisfying the payment in the ordinary course element of the § 547(c)(2) exception, Allstate failed to prove by a preponderance that the payments were made according to ordinary business terms under § 547(c)(2)(C), that is, consistent with or within the general parameters of industry practice.

 "The objective prong of § 547(c)(2)(C) requires proof that the payment is ordinary in relation to the standards prevailing in the relevant industry."

See *Schnittjer v. Alliant Energy Co. and Interstate Power & Light Co. (In re Shalom Hospitality, Inc.)*, 293 B.R. 211, 215 (Bankr.N.D.Iowa 2003), citing *U.S.A. Inns*, 9 F.3d at 684. "[O]rdinary business terms refers to the range of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection (C)." *Id.*; see also *Manty v. Miller & Holmes, Inc. (In re Nation–Wide Exchange Serv., Inc.)*, 291 B.R. 131, 151 (Bankr.D.Minn.2003); *Peltz v. Hyatt Regency Beaver Creek (In re Bridge Info. Sys., Inc.)*, 297 B.R. 754, 758 (Bankr. E.D.Mo.2003); *Stewart v. Barry County Livestock Auction, Inc. (In re Stewart)*, 274 B.R. 503, 514 (Bankr.W.D.Ark.2002).

 "Many courts have relied on expert testimony to establish industry practice as to the length of time it usually takes suppliers to be paid by customers, although expert testimony is not required." *Shalom Hospitality*, 293 B.R. at 215 (citations omitted). "Rather, the transferee can meet its burden of proof under § 547(c)(2)(C) by producing the testimonial evidence of one [of] its employees as to the range of the prevailing practices within the relevant industry provided that such testimony is based on the employee's first hand knowledge." *See Peltz v. The Denver Post Corp. (In re Bridge Info. Sys., Inc.)* 297 B.R. 759, 765 (Bankr. E.D.Mo.2003), citing *In re Midway Airlines*, 69 F.3d 792, 797 (7th Cir.1995); *U.S.A. Inns*, 9 F.3d at 680.

 In this case, Brown testified at length regarding his experience in the in-

---

4. See also, *Mastercraft Graphics*, 157 B.R. at 921 (what occurred here is not appropriately characterized as a restructuring, but rather is a compromise of a pending civil suit for a writ of replevin and judgment).

dustry of heavy duty truck financing, dealer-service franchises, third-party paper, and even his personal knowledge of small fleet owner-operator trucking. He persuasively demonstrated himself to be an long-experienced and seasoned authority on his company. Had his testimony been uncontroverted, the Court would have understood that use of withholding trucks on past due accounts, commencing various types of collection litigation, and entering into promissory notes to restructure delinquent accounts, is commonplace among heavy duty truck dealer-servicer franchises and financing companies.

Sibilrud, however, credibly testified that, during the year prior to bankruptcy, he had other trucks being serviced elsewhere, at as many as five other truck servicing companies, under similar open accounts and also carrying past-due balances, some much higher than his balance with Allstate. None but Allstate filed mechanic's liens, suggested promissory notes or attempted to otherwise negotiate a workout or restructure the outstanding debt, commenced litigation or obtained judgments against him, or sought to garnish his wages. None but Allstate retained a truck; the others returned this trucks to him on his oral promise to pay. Because Allstate offered no testimony regarding policies beyond its own within the industry, and because Sibilrud competently disputed Brown's description of industry practice, Allstate failed to prove § 547(c)(2)(C) by a preponderance.

### III. DISPOSITION

IT IS HEREBY ORDERED:

1. The transfers from the debtor Robert K. Sibilrud to the defendant Allstate Sales & Leasing Corporation in the total amount of $2,000 were not made in the ordinary course pursuant to 11 U.S.C. § 547(c)(2);

2. The transfers from the debtor Robert K. Sibilrud to the defendant Allstate Sales & Leasing Corporation in the total amount of $2,000 constitute preferential transfers and are hereby avoided pursuant to 11 U.S.C. § 547(b);

3. Judgment shall be entered against Allstate Sales & Leasing Corporation and in favor of the Trustee, Randall L. Seaver, in the amount of $2,000; and

4. The $2,000 shall be preserved for the benefit of the bankruptcy estate in the main case # 02–32667 pursuant to 11 U.S.C. § 551.

LET JUDGMENT BE ENTERED ACCORDINGLY.